**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- x

JENNIFER PALMER,                           :      Civil Case No.

               Plaintiff,        :

      v.                              :

                                   :

ECAPITAL CORP., ECAPITAL ASSET BASED    :      **COMPLAINT**
LENDING CORP. (formerly known as GERBER    :
FINANCE INC.), MARIUS SILVASAN, JONATHAN  :
STAEBLER, STEVEN McDONALD and CRIS NEELY, :      <u>**Jury Trial Demanded**</u>
in their individual and professional capacities,      :

                                   :

               Defendants.      :
------------------------------------------------------------------- x

Plaintiff Jennifer Palmer ("Plaintiff" or "Ms. Palmer"), by and through her attorneys,

Wigdor LLP, as and for her complaint against Defendants eCapital Corp. ("eCapital Corp."), its

subsidiary eCapital Asset Based Lending Corp. ("ABL") (formerly known as Gerber Finance

Inc. ("GFI")) (collectively "eCapital"), Marius Silvasan ("Mr. Silvasan"), Jonathan Staebler

("Mr. Staebler"), Steve McDonald ("Mr. McDonald"), and Cris Neely ("Mr. Neely") (together,

"Defendants"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      Jennifer Palmer beat the odds by building a thriving, high-profile career as one of

the few female CEOs in the financial services industry.

2.      Ms. Palmer has been hailed as "a finance insider"[1] and "a person of great

influence,"[2] who has succeeded "as a woman in what has traditionally been a guy's role"[3] with

"the greatest work ethic of anyone I know."[4]

---

[1]    https://medium.com/authority-magazine/women-leading-the-finance-industry-why-you-should-make-a-game-out-of-budgeting-with-jennifer-890d65a7942f
[2]    Id.
[3]    https://www.podpage.com/courageous-conversations-with-fran-pastore/19-shifting-norms-with-jennifer-palmer-ceo-of-gerber-finance/
[4]    GFI Founder and former CEO Gerald Joseph in abladvisor.com/news/3550/gerber-finance-appoints-palmer-as-predident-toyberman-named-coo.

3.       As CEO of ABL, Ms. Palmer garnered numerous accolades from the asset-based finance industry, including being named one of the Top Women in Asset-Based Lending by Asset-Based Finance Journal, to the Commercial Finance Association's inaugural 40 under 40 list, as an honoree at the New York Institute of Credit Women's Division "Women in Achievement" Awards, and as a contributor to Forbes and a member of its Finance Council.

4.       As a testament to her leadership in the finance industry, Ms. Palmer is also President of the Secured Finance Network[5], an international trade group of the asset-based lending, factoring and supply chain finance industries, with almost 300 member organizations.

5.       Recognized for being "extremely passionate about supporting women"[6] and "encouraging more women to achieve C suite roles,"[7] Ms. Palmer has used her prominence in the industry to support the success of other women.

6.       She has advocated for increasing access to capital for women[8], offered advice to women-owned and -led companies to encourage their success[9], and advocated for workplace policies and legislation that support women[10], all while promoting ABL in the process.  She has also spoken candidly about managing a leadership role while raising four young children.[11]

---

[5]      The Secured Finance Network was formerly known as the Commercial Finance Association.
[6]      https://www.foodprocessing.com/podcasts/food-for-thought/finance-female-entrepreneurs/
[7]      https://www.audacy.com/podcasts/women-in-finance-108744/new-ceo-in-times-of-crisis-with-jennifer-palmer-gerber-finance-1363948198
[8]      See, e.g. https://www.forbes.com/sites/forbesfinancecouncil/2021/04/13/how-financiers-can-better-support-women-founders/?sh=2dd850bc594c (urging financial community to increase gender diversity and explaining why women-led businesses are good investments).
[9]      See, e.g. https://www.newhope.com/finance-and-fundraising/3-things-women-run-companies-should-consider-when-seeking-financing (providing financial advice to female entrepreneurs).
[10]     See, e.g. https://medium.com/authority-magazine/women-leading-the-finance-industry-why-you-should-make-a-game-out-of-budgeting-with-jennifer-890d65a7942f (advocating for national paid family leave) and https://www.sfnet.com/home/industry-data-publications/the-secured-lender/magazine/tsl-article-detail/interview-with-jennifer-palmer (discussing importance of flexible schedules and paid leave).
[11]     https://www.sfnet.com/home/industry-data-publications/the-secured-lender/magazine/tsl-article-detail/interview-with-jennifer-palmer

7.    Her support of women and mothers extends to her time on the junior board of Dress for Success, a global not-for-profit that empowers women to achieve economic independence, and to her establishment of the Gerber Finance Foundation, which has provided more than 40,000 meals to low-income children and raised funds to send girls from low-income families to sleep away camp.  She has also served as a Girl Scout Troop Leader.

8.    Despite being hand-picked by her male predecessor to take over from him as CEO of eCapital Corp. subsidiary ABL, successfully guiding the company through the unprecedented challenges posed by the pandemic and growing ABL's book exponentially, Ms. Palmer ultimately encountered the same diminution of her accomplishments, authority and visibility faced by so many other women in the industry when she was demoted and stripped of the authority granted to her male counterparts.

9.    When she spoke up about gender discrimination by eCapital, Ms. Palmer was demeaned and derided by no less than its CEO, Marius Silvasan, who infantilized her by calling her discrimination complaint "childish" and her reports of retaliation "non-sense [sic]."

10.    Rather than recognize Ms. Palmer's achievements, eCapital and Mr. Silvasan isolated and ultimately demoted Ms. Palmer while elevating and expanding the influence of her male colleagues.

11.    On September 8, 2022, Ms. Palmer filed this action.  A short while later, on December 5, 2022, Defendants fired her, claiming they had decided to "eliminate" her position. They promptly named a less-qualified man to replace her.

## NATURE OF CLAIMS

12.    Plaintiff seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of Title VII of the

Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("State Human Rights Law"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("City Human Rights Law"), and New York Labor Law § 740 (New York's "Whistleblower Law").

## ADMINISTRATIVE PROCEDURES

13.     On September 8, 2022, Ms. Palmer filed a charge of discrimination and retaliation, arising out of the facts described herein, with the EEOC, alleging violations of Title VII.  On March 2, 2023, Ms. Palmer supplemented her EEOC charge with new allegations, including that her employment had been terminated in retaliation for her complaints of discrimination.

14.     On April 11, 2023, the EEOC issued Ms. Palmer a Notice of Right to Sue.  She has asserted her Title VII claims within 90 days of its receipt.

15.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

16.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

18.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

19.     Plaintiff Jennifer Palmer was the Chief Executive Officer of ABL and is a resident of the State of New York.  At all times, Jennifer Palmer was an "employee" under all relevant statutes.

20.     Defendant eCapital Corp. is incorporated in Florida with its principal office at 20807 Biscayne Blvd. #203, Aventura, Florida 33180.  At all relevant times, eCapital Corp. met the definition of an "employer" under all relevant statutes.  eCapital Corp. is the parent company of ABL.

21.     Defendant ABL is a domestic corporation incorporated in New York with its principal office at 8 West 40th Street, New York, New York 10018.  At all relevant times ABL met the definition of an "employer" under all relevant statutes.

22.     Defendant Marius Silvasan is the Chief Executive Officer of eCapital Corp. and a resident of Florida.  Mr. Silvasan actively and knowingly engaged in acts or omissions that aided or abetted unlawful actions against Ms. Palmer.

23.     Defendant Jonathan Staebler is the General Counsel of eCapital Corp. and a resident of Florida.  Mr. Staebler actively and knowingly engaged in acts or omissions that aided or abetted unlawful actions against Ms. Palmer.

24.     Defendant Steven McDonald is the President of eCapital Corp., Vice President of ABL, a member of ABL's board of directors, and a resident of Canada.  Mr. McDonald actively

and knowingly engaged in acts or omissions that aided or abetted unlawful actions against Ms. Palmer.

25.     Defendant Cris Neely is the Chief Financial Officer ("CFO") of eCapital Corp., member of the Board of Directors of ABL and a resident of Florida.  Mr. Neely actively and knowingly engaged in acts or omissions that aided or abetted unlawful actions against Ms. Palmer.

**FACTUAL ALLEGATIONS**

I.     **Background**

26.     Ms. Palmer received her Bachelor of Arts from Marist College and her law degree from Fordham University School of Law.

27.     She began her professional career in 2005 as an in-house zoning specialist for T-Mobile.

28.     In July 2006, Ms. Palmer was hired by ABL's founder Gerald Joseph to work on the marketing team of the asset-based lending company, which lends money to small and medium size businesses by using the clients' assets, such as accounts receivable, as collateral.

29.     Because of her excellent work, Ms. Palmer was promoted from Vice President to Senior Vice President in 2011.

30.     In recognition of Ms. Palmer's immense talent, Mr. Joseph elevated her to President in 2013 with the intention of transitioning her into the CEO role when he was ready to hand the reins over to a successor.

31.     In 2017, ABL was acquired by Trade Finance Solutions.  Trade Finance Solutions subsequently changed its name to Global Merchant Fund and then ultimately to eCapital Corp.

32.     eCapital Corp's leadership team, which consisted of Mr. Silvasan, Steven McDonald (President) and Tony Howard (Chief Credit and Portfolio Officer), traveled frequently to New York on behalf of eCapital Corp. as part of their due diligence in acquiring ABL.  All of Ms. Palmer's meetings with eCapital Corp. during this period in 2017, including with Mr. Silvasan about her continued employment, occurred in New York.

33.     Ms. Palmer's initial employment agreement, which she negotiated from New York, required that she "perform [her] duties and responsibilities principally in the New York, New York area" and that she would be "allowed to perform her duties and responsibilities from her home residence [which was also in New York] on Fridays."

34.     Pursuant to the agreement, ABL was required to "review [Ms. Palmer's] salary from time to time," which ABL had the "sole discretion" to "increase."

35.     Moreover, the agreement required that Ms. Palmer give any contractually required "[n]otices" to Mr. McDonald.

36.     Later, in the fall of 2019, ABL relocated to new office space within New York. Mr. Silvasan oversaw the buildout of the new space, including approving the design and budget. Mr. Silvasan also occasionally worked from ABL's New York offices.

37.     Mr. Joseph stepped down as ABL's CEO on December 31, 2019, but remained involved as a strategic advisor and chairman of the board under a transition plan designed to eventually lead to his full retirement.

38.     In anticipation of Mr. Joseph's resignation, Mr. Silvasan traveled to New York to discuss Ms. Palmer taking over as ABL's CEO.

39.     Ms. Palmer ultimately stepped into the role, making her the youngest and first female CEO in ABL's 20-year history.

40.     As a result, on December 9, 2019, Ms. Palmer's employment agreement was amended to reflect, among other things, her new role as President and CEO of ABL.

41.     eCapital Corp. and ABL were wholly interconnected.  For instance:

    a.     Ms. Palmer was required to "report" to Mr. Silvasan, who was the CEO of eCapital Corp., ABL's "Parent";

    b.     eCapital Corp. had authority to "review" and "increase" Ms. Palmer's salary;

    c.     eCapital Corp. was required to maintain "director and officer liability insurance policies" for Ms. Palmer; and

    d.     Mr. McDonald – eCapital Corp.'s President and ABL's Vice President – signed the amended agreement.

42.     Unfortunately, eCapital Corp. is a male-dominated company.

43.     Ms. Palmer was the only female CEO among eCapital Corp.'s subsidiaries, and the parent company has only two women on its 12-person executive team.

44.     Despite being a woman in a male-dominated environment, Ms. Palmer excelled after her elevation to CEO.

45.     In a little more than two years, Ms. Palmer grew ABL's asset-based portfolio by more than 140% even as both existing and potential clients had less need for capital from ABL because of funding available under the Coronavirus Aid, Relief and Economic Security (CARES) Act.  Indeed, she exceeded her bottom-line budget in 2021 despite these obstacles, so much so that 2021 was ABL's second most profitable year since its inception in 1996.

46.     She also handled a client's bankruptcy with minimal losses to ABL, oversaw the work outs of two bad credits with no losses and replaced a bank as part of her bank line, all while

guiding a team based in New York City and San Francisco, the epicenters of the global Coronavirus pandemic.

## II.   eCapital's Pattern of Discrimination

47.    From the very outset of Ms. Palmer's tenure as CEO of ABL, eCapital worked to diminish her.

48.    For example, Ms. Palmer was exposed to a level of scrutiny to which her male predecessor Mr. Joseph had never been subjected.

49.    Mr. Joseph served as ABL's CEO for three years with eCapital Corp. as its parent.

50.    During that time, Mr. Silvasan had minimal involvement with ABL, instead trusting Mr. Joseph's professional judgment in running the company.

51.    This was true even in 2019, when there was attrition in ABL's book of business under Mr. Joseph.

52.    This respect for, and deference to, expertise evaporated as soon as Ms. Palmer, a woman, stepped into the CEO role on January 1, 2020, shortly before the start of the pandemic.

53.    Mr. Silvasan immediately began to question ABL's portfolio size, something he never did to Mr. Joseph, peppering Ms. Palmer in her first month as CEO with emails questioning ABL's pipeline of new clients, expressing doubt about Ms. Palmer's ability to grow the book of business and, for the first time since ABL was acquired in 2017, requiring that she provide him with weekly pipeline reports.

54.    The following month, Mr. Silvasan complained to Ms. Palmer about the value of ABL's book and predicted falsely that ABL would not meet its immediate budget of booking $30 million to $35 million in business, which it in fact did.

55.     By the third month of Ms. Palmer's tenure, Mr. Silvasan began to isolate her by, for example, neglecting to inform her that eCapital Corp.'s origination standards had changed to reflect a more conservative approach due to the pandemic, an approach that Ms. Palmer had previously recommended.

56.     This pattern of diminishing and isolating women bled into other aspects of Ms. Palmer's work at eCapital.

57.     For example, Mr. Silvasan would solicit credit advice from ABL for deals he was considering.

58.     He frequently agreed with the feedback provided by men from ABL but routinely questioned credits proposed by Ms. Palmer or other female members of her team.

59.     Even ABL's use of outside counsel was affected by eCapital's bias against women.

60.     In May 2021, Ms. Palmer asked that ABL's longtime female outside counsel be allowed to join a call to respond to a question about structuring deals, as she was more experienced in the topic than anyone else scheduled for that call.  Mr. Silvasan reacted negatively to the request.

61.     He directed Ms. Palmer to fire that woman, as well as a second female outside counsel who had produced excellent work for ABL, and ordered that going forward Ms. Palmer was required to centralize ABL's outside legal services under a male partner at a different firm, who did not specialize in ABL's industry.

62.     Ms. Palmer protested that she be allowed to continue to work with the women.  In the end, she was allowed to keep only one of them, and only for limited and very specific purposes.

63.     She was told that the other woman must be fired because of a supposed conflict with eCapital Corp.  Yet eCapital Corp. subsequently waived a similar alleged conflict so that it could retain a male outside counsel.

64.     The male attorney that Ms. Palmer was forced to work with proved himself consistently less competent, less responsive, and more expensive than the female outside counsel who Ms. Palmer was forced to fire.

65.     Mr. Silvasan also routinely undermined Ms. Palmer in favor of male executives.

66.     For example, most business-related emails Mr. Silvasan sent to Ms. Palmer copied her male predecessor.

67.     He further diminished Ms. Palmer by routinely going around her and speaking to her male predecessor without her being present.

68.     To further drive home the point that he valued the opinions of men over Ms. Palmer, on three occasions Mr. Silvasan flew to New York for business[12] and invited male executives to dinner but excluded Ms. Palmer.

69.     At one particular dinner organized by Mr. Silvasan in September 2021, Ms. Palmer's absence was so conspicuous that Mr. Joseph invited her to attend.

70.     In a further attempt to diminish Ms. Palmer's stature within eCapital, Mr. Silvasan repeatedly ignored Ms. Palmer's emails and took credit for her ideas, such as slowing growth during the pandemic and establishing weekly executive calls.

71.     eCapital also did not welcome the considerable attention Ms. Palmer received from the press, preferring instead that its male executives have the limelight.

---

[12]     Prior to the pandemic, Mr. Silvasan worked from ABL's office when he was in New York and on at least one occasion expensed his ground travel to ABL.

72.     In December 2021, Mr. Silvasan told a room full of male executives that he was concerned about press coverage focusing on Ms. Palmer's accomplishments and complained that there was a "cult-like following" surrounding her.

73.     In February 2022, eCapital Corp.'s Chief Marketing Officer reinforced the idea that only men were to represent eCapital, telling Ms. Palmer's team that going forward Mr. Silvasan and Charles Sheppard, Chief Product Officer ("CPO") and Chief Operating Officer ("COO"), would be the "face" of eCapital.

74.     During this same period, eCapital continued its campaign to render Ms. Palmer invisible by taking out two prominent ads in an industry trade publication to celebrate women leaders at eCapital Corp. but omitting her from both, despite Ms. Palmer appearing on the cover of that very issue and being quoted prominently in the lead article about her efforts to increase ABL's portfolio share of women-owned and -led companies to 50%.[13]

75.     eCapital's hostility toward women was also laid bare in conversations Ms. Palmer had with Mr. Silvasan regarding her commitment to increasing the number of ABL's clients that are owned or led by women.

76.     During a meeting with Mr. Silvasan in July 2021, Ms. Palmer reiterated her goal of increasing ABL's portfolio exposure to women-owned and -led companies from 34% to 51%.

77.     Mr. Silvasan responded by warning Ms. Palmer not to increase her commitment to funding women in a way that "ostracized men."

78.     Mr. Silvasan's false assumption that more female clients would mean fewer male ones, and his commitment to prioritizing the latter, pulls back the curtain on his treatment of Ms.

---

[13]     See https://issuu.com/thesecuredlender/docs/tsl-4-22-digital at p.1 (cover featuring Ms. Palmer); p. 39 (eCapital Corp.'s advertisements celebrating the contributions of six female employees); p. 45 (picturing 45 women under the tagline "Celebrating all our unique and powerful women"); and p. 110  (feature article).

Palmer: business was a zero-sum game when it came to gender, and Mr. Silvasan had thrown his lot in with the men.

79.     Mr. Silvasan doubled down on this sexist thinking in December of 2021 during contract negotiations with Ms. Palmer.

80.     He ordered her not to narrow ABL's business exclusively to women-led businesses and directed her to continue to pitch and service men.

81.     Ms. Palmer had no intention of focusing ABL exclusively on women-led businesses (as evidenced by the goals she presented to Mr. Silvasan in July 2021) or turning away male-led ones, but Mr. Silvasan's assumption that she did again reveals his view that to advance women necessitates setting back men.

82.     He had no issue, however, with eCapital Corp.'s male-led Freight Forwarding Division ("FFD") targeting male clients, as evidenced by the fact that photos of potential customers exclusively feature men in FFD's "tone of voice" guide, a document that provides guidance on word choice, communication style and emotional tone to reach potential customers most effectively.

### III.   eCapital Attempts to Force Out Ms. Palmer and Elevate a Man in Her Place

83.     In the spring of 2021, Mr. Silvasan informed Mr. Joseph and Ms. Palmer that the parent company was considering rebranding ABL (then known as GFI) under the "eCapital" name.

84.     Ms. Palmer asked for ABL to have a seat at the table for the corporate rebranding conversations, but Mr. Silvasan refused, continuing his pattern of shutting her out.

85.     Ms. Palmer was determined that if the parent company was going to rebrand ABL, it should be done in a way that protected the portfolio she had been so successful in

building.  Toward that end, on June 17, 2021, Ms. Palmer sent Mr. Silvasan a plan to roll out the rebranding slowly over 18 months to ease ABL's clients into the process.

86.     Mr. Silvasan ignored Ms. Palmer's carefully considered plan, as well as a later proposal she made for a six-month rebranding roll out, never even bothering to acknowledge her emails.

87.     In June 2021, Ms. Palmer suggested to Mr. Silvasan that they begin talking about her contract, which was set to renew in September.

88.     The next month, Ms. Palmer met with Mr. Silvasan where, as explained above, he made his sexist remarks about Ms. Palmer's goals to increase the percentage of ABL's business from women-owned and -led companies.

89.     At the meeting, Mr. Silvasan again raised the prospect of rebranding ABL and solicited Ms. Palmer's thoughts on whether she wanted to keep ABL's identity separate or merge it into eCapital Corp.'s brand.

90.     Ms. Palmer expressed that ABL should maintain an identity separate from eCapital Corp., and Mr. Silvasan agreed that this was the best course of action.

91.     For the first time, Mr. Silvasan mentioned that he was interviewing a candidate to lead the parent company's asset-based lending group.

92.     Ms. Palmer later learned that the candidate was Brian Cuttic, whose hiring as Managing Director in the parent company's asset-based lending group was announced internally the following month and who would later feature prominently in Mr. Silvasan's effort to force out Ms. Palmer.

93.     In early December, Mr. Silvasan, Mr. Joseph, Mr. Neely and Mr. Howard – eCapital Corp.'s all male leadership team – met to discuss Ms. Palmer.

94.     During the meeting, Mr. Silvasan falsely accused Ms. Palmer of creating a delay in September by suggesting changes to her contract when in fact he had been the one delaying the process.

95.     The men decided, contrary to Mr. Silvasan's agreement with Ms. Palmer in July, that the parent company would rebrand ABL under the eCapital Corp. name so that it would become the "eCapital shop" of asset-based lending.

96.     Two days later, Ms. Palmer (who was in New York) and Mr. Silvasan had a Zoom video conference in which he informed her of the rebranding decision.

97.     Mr. Silvasan then asked Ms. Palmer if she would accept a role as co-CEO of the rebranded entity along with the newly-hired Mr. Cuttic.

98.     Ms. Palmer was shocked that she was being demoted, and it was not lost on her that none of the men at her level had been asked to accept a co-CEO.

99.     Ms. Palmer protested her demotion to co-CEO and asked Mr. Silvasan to explain how a co-CEO role would even work.

100.    Mr. Silvasan responded by falsely (and stereotypically) accusing Ms. Palmer of being "aggressive" and "confrontational" and threatened to end the conversation.  He also told Ms. Palmer that she could quit if she was not willing to accept the demotion.

101.    This is entirely consistent with how Mr. Silvasan treated Ms. Palmer throughout the course of their work relationship: where he would have applauded a man as strong for standing up for himself, he labeled her with classic sexist stereotypes of being aggressive and confrontational.  In fact, Mr. Joseph frequently lost his temper with Mr. Silvasan, but Mr. Silvasan never called Mr. Joseph "aggressive" or "confrontational."

102.    Mr. Silvasan said he needed time to reflect on how he wanted to proceed given her position that a co-CEO was a dealbreaker but assured her that Mr. Cuttic had not been offered the CEO role.

103.    On December 13, 2021, Mr. Silvasan notified Ms. Palmer by email that ABL would merge into eCapital Corp.'s Asset-Based Lending group and be rebranded as "eCapital Asset-Based Lending" with her as the new entity's CEO.

104.    The following week, Ms. Palmer attended eCapital Corp.'s holiday party.

105.    As she was leaving, Ms. Palmer stopped to say goodbye to Mr. Silvasan's wife, who grabbed Ms. Palmer and said directly into her ear, "You are such a liar.  You are one of *those* girls.  A real bitch.  You and all those New Yorkers are like 'ahhh ahhh.'  I heard what you did.  Marius is so disappointed in you.  We all are.  We are hiring a search firm for you.  He cares and you will see it, you bitch."

106.    Despite this appalling display, Ms. Palmer took Mr. Silvasan at his word, and in December 2021, she began to prepare for the rebranding and her new role as CEO of ABL.

107.    On January 3, 2022, she notified her team of the plan to rebrand and started outlining the steps needed to affect the change, keeping Mr. Silvasan informed along the way.

108.    On January 12, 2022, Ms. Palmer confirmed with Mr. Silvasan that they were on the same page about the rebranding in that it was just a name change.

109.    Later that month, she heard from a colleague that someone else had been hired in the parent company's asset-based lending group.

110.    Mr. Silvasan assured her that the new hire was not in the asset-based lending group and that Mr. Cuttic would be moving to a different division.

111.    On February 28, 2022, Ms. Palmer was relieved to receive a draft employment contract which listed her title as "CEO Asset-Based Lending."

112.    Two days later, on March 2, 2022, she met with Mr. Silvasan and Mr. Sheppard, her supervisors, understanding it would be a brainstorming meeting where the group would collaborate on future plans.

113.    To her shock, the two men presented her with a reorganization plan that put her as co-CEO with Mr. Cuttic, despite Mr. Silvasan assuring her for months that she would be the sole CEO and negotiating her contract with that understanding.

114.    Ms. Palmer said she needed time to consider how she wanted to move forward, now that it was clear that Mr. Silvasan was using the rebranding as an excuse to demote her and force a male co-CEO to take over responsibilities.

115.    Close on the heels of the reorganization shock, Ms. Palmer was faced with yet another example of her male colleagues receiving unwarranted preferential treatment.

116.    On March 11, 2022, Ms. Palmer learned for the first time from Mr. Cuttic that he had more credit authority to book a new deal than she did.

117.    In practice, this meant that during the two-person approval process, Ms. Palmer could only approve a $2 million line of credit, but Mr. Cuttic could approve a $3 million line.

118.    This was the case even though Ms. Palmer had 16 years of experience at ABL, five of those working with shareholders under eCapital Corp., compared to Mr. Cuttic who had been with eCapital Corp. for a mere seven months.

119.    On March 17, 2022, after more than two years of being ignored and diminished to the point of having eCapital foist a male colleague on her to "babysit" her as co-CEO, Ms.

17

Palmer emailed Mr. Silvasan from New York, confronting him with examples of the discrimination she had faced.

120.    True to form, Mr. Silvasan responded by calling her "childish," infantilizing her yet again.

121.    On March 24, 2022, Ms. Palmer, through her New York counsel, detailed in writing the numerous ways in which she had been discriminated against and asserted her right to bring claims if the situation was not remedied.

122.    eCapital immediately withdrew the employment agreement it had previously offered to Ms. Palmer, replacing it with even worse terms and a transparent threat to sue Ms. Palmer if she pursued claims.

123.    For example, the withdrawn agreement included a standard indemnification provision that required ABL to defend, indemnify and hold Ms. Palmer harmless from all claims relating to her work for or with ABL.  By contrast, the retaliatory agreement carved out an exception to indemnification for any claim brought against Ms. Palmer *by eCapital*, sending a clear message threatening to sue Ms. Palmer if she asserted her rights.

124.    The retaliatory contract further diminished Ms. Palmer's responsibilities as CEO. For the first time, eCapital added a requirement that Ms. Palmer comply with any future changes to the organizational structure of eCapital Corp. or ABL without first knowing what those changes would be.

125.    This provision stripped Ms. Palmer of the ability to perform her fiduciary responsibilities as CEO by ensuring, for example, that any changes to the organizational structure are lawful.

126.     It also revealed eCapital's true intentions.  While the revised contract purported to install Ms. Palmer as CEO of ABL's rebranded entity, this newly inserted provision enabled eCapital to continue to discriminate against Ms. Palmer by installing a co-CEO or otherwise taking steps to effectively demote her.

127.     Upon information and belief, Ms. Palmer's male CEO colleagues were not required to sign contracts containing this provision.

128.     Ms. Palmer attempted to negotiate these retaliatory terms out of the agreement to protect herself against discrimination, but the Defendants refused to remove them.[14]

129.     Ultimately, Mr. McDonald emailed Ms. Palmer on April 14, 2022, with an ultimatum: "[I]f you decline to sign the draft contract now in your hands, then after April 30, 2022 you will no longer be [sic] have an employment contract and, thus, no longer be employed by eCapital ABL."

130.     In a blatant attempt to force Ms. Palmer out, the Defendants left her with the excruciating choice of either signing an onerous agreement or losing her job.

131.     In the end, Ms. Palmer was left with no choice but to sign the agreement to remain employed.

132.     Ms. Palmer and Mr. McDonald signed the new agreement, which reaffirmed that ABL was centrally managed by eCapital Corp.  Among other changes, the agreement provided that:

     a.  Ms. Palmer was required to report to Mr. Sheppard, eCapital Corp.'s COO, although she continued to work from New York;

---

[14]     In fact, Ms. Palmer asked during contract negotiations that she only be required to comply with future changes that were "lawful."  eCapital refused.

b.  She was required to (i) acknowledge that ABL was "part of the eCapital group"; (ii) concede that ABL would "henceforth operate as a unit" of the group; and (iii) "align and consolidate [ABL's] organizational structure and its operations" as directed by eCapital Corp.'s CEO (Mr. Silvasan) and eCapital Corp.'s COO (Mr. Sheppard);

c.  The new agreement required that ABL "share services" with other eCapital divisions, including, "without limitation, marketing, information technology, human resources, sales, legal, accounting, treasury and technology platform services"; and

d.  Certain ABL employees would be required to perform "shared services" responsibilities for eCapital's other divisions.

133.   eCapital continued to discriminate and retaliate against Ms. Palmer.  For example, eCapital Corp.'s General Counsel Mr. Staebler refused to allow Ms. Palmer to seek the advice of its auditors and/or outside counsel regarding an issue arising out of eCapital's request that she serve as signatory to ABL's audited financial statement.

134.   As CEO, Ms. Palmer sought professional advice regarding a provision in the publicly filed statement that she was required to sign as CEO.  The provision required her to attest that (a) all known actual or possible litigation claims and assessments whose effects should be considered had been disclosed and were considered in preparing the financials; (b) as the signatory she was unaware of any possible issues or violations or noncompliance with applicable laws and regulations; and (c) that ABL had in fact complied with all known laws and regulations and policies relative to the prevention of illegal acts.

135.    Given that Ms. Palmer had notified eCapital of her intention to assert discrimination and retaliation claims, she wanted to speak with audit and legal professionals to ensure she could in good conscience sign the attestations.

136.    Rather than applaud Ms. Palmer's diligence and scrupulous adherence to her legal obligations, Mr. Staebler refused to let her seek advice.

137.    Instead, eCapital insisted that she rely on *its* word that the auditors and outside counsel had advised that she could sign the financial statement and then attacked her as "disloyal" for even having asked to seek the advice of professionals employed by eCapital.

138.    eCapital then stripped Ms. Palmer of signing authority, authorizing someone else (a non-CEO) to sign the financial statements rather than allow her to seek professional advice.

139.    When Ms. Palmer protested that these actions were a form of retaliation, Mr. Silvasan belittled her, as is his fashion, by calling her comments "non-sense [sic]."

140.    Upon information and belief, to date eCapital has not conducted any investigation into Ms. Palmer's claims of discrimination and retaliation, choosing instead to reject them out of hand.

## IV.    eCapital Renders Ms. Palmer CEO in Name Only

141.    Unable to force Ms. Palmer to agree to a demotion by consenting to have Mr. Cuttic "babysit" her as co-CEO, eCapital achieved the same result by other means – after the rebranding took effect on April 4, 2022, Defendants methodically diminished Ms. Palmer's authority as CEO and just as assiduously elevated Mr. Cuttic.

142.    The most striking example of this practice was the distribution of deals between the two employees.  eCapital limited Ms. Palmer's portfolio to deals in the narrow area of "wellness" – a stereotypically female industry – whereas all other ABL deals went to Mr. Cuttic.

143.    In effect, eCapital installed Mr. Cuttic as the CEO of ABL, with Ms. Palmer being moved into a significantly smaller role.

144.    Ms. Palmer objected to the inequitable assignment of industries multiple times.

145.    For example, during a phone call with Mr. Silvasan, Mr. Sheppard and Mr. Howard on May 2, 2022, Ms. Palmer (who was in New York) asked that her portfolio be expanded to industries outside of wellness.  Mr. Sheppard laughed at her.

146.    The Defendants confirmed that Ms. Palmer was CEO in name only by refusing her request that Mr. Cuttic report to her, even though such a hierarchy would mirror similar reporting structures elsewhere in the organization.

147.    Furthermore, Ms. Palmer was expected with limited exceptions to refer to Mr. Cuttic any deals that she generated outside of the wellness space without credit for those deals counting towards her division's performance/net profits, thereby reducing her earning potential.

148.    Ms. Palmer had spent her career as a generalist and was known for developing long-lasting client relationships.  Under the new structure, however, Ms. Palmer was precluded from working on deals unrelated to wellness.  She had to send them to Mr. Cuttic.

149.    eCapital even reneged on giving Ms. Palmer this small sliver of the universe of possible deals when Mr. Silvasan decided that a $22 million wellness deal would go to another eCapital Corp. group.

150.    Furthermore, although Ms. Palmer was originally told by Mr. Silvasan and Mr. Sheppard that she could retain non-wellness deals generated through her relationships with clients or referral sources, Mr. Howard subsequently suggested that Ms. Palmer "hand off" to Mr. Cuttic a $25 million deal on which she had been working.

151.   Mr. Sheppard also admitted that he and other male executives were angry that Ms. Palmer requested to keep a $50 million deal in the oil and gas industry – the largest ever brought to eCapital Corp. – even though she generated it through a prior client relationship, and Mr. Silvasan had greenlighted her to issue a proposal to the potential client and begin conducting due diligence.[15]

152.   Another example of the Defendants' efforts to undermine Ms. Palmer's authority was its inequitable staffing of the Internal and External Credit Committees.

153.   When the rebranding took effect on April 4, 2022, ABL's Internal Credit Committee ("ICC") consisted of Ms. Palmer, Mr. Joseph, Kevin McGarry (ABL's Chief Credit Officer), Melissa Fleishman (ABL's Head of Underwriting) and Entela Semini (ABL's Senior Vice President of Operations).

154.   Any deal of more than $2 million approved by two of the three ICC members consisting of Ms. Palmer, Mr. Joseph and Mr. McGarry, would also have to be approved by the External Credit Committee ("ECC") comprised of Mr. McGarry and Mr. Howard.

155.   As a result, Mr. McGarry, Ms. Palmer's subordinate, had the power to vote down a deal she had approved.  By virtue of his membership in the parent company's ECC, he also had two votes to her one and a second chance to torpedo deals Ms. Palmer approved at the ICC stage. To rectify this untenable situation, Ms. Palmer requested that Mr. McGarry be removed from the

---

[15]       Significantly, Ms. Palmer never had the opportunity to present the deal to the appropriate committees. After Mr. Sheppard showed Mr. Howard a preview of the deal prepared by Ms. Palmer, Mr. Howard sent her a curt email that the deal would not proceed "under any circumstance," that his decision was "effective immediately" and final, and that she was to "close out the file."  Mr. Howard later told Ms. Palmer that the deal was ultimately rejected because, among other things, it was over eCapital's deal cap of $30 million.  However, Ms. Palmer had identified another lender willing to participate in the deal to close the $20 million gap.  According to Mr. Howard, "our guys" spoke to the additional lender without Ms. Palmer's knowledge and turned down the offer.  Mr. Howard later admitted that he denied Ms. Palmer's deal because Mr. Cuttic had been allowed to close on a $30 million oil and gas deal.

ECC or, in the alternative, that she be given a vote on the ECC for deals she approved on the ICC.  Mr. Howard denied both requests.

156.    When Mr. McGarry was offered a promotion to Chief Risk Officer of eCapital Corp. (a position he ultimately declined), Mr. Howard suggested that a different male team member replace Mr. McGarry and that this man, together with Ms. Palmer and Ms. Fleishman, would have the discretion to approve deals for under $2 million.

157.    By contrast, Mr. Cuttic and one of his male colleagues could approve deals under $3 million without a third person, and the same was true for another male-led eCapital Corp. affiliate.

158.    Further underlining the extent to which eCapital had subverted Ms. Palmer's authority, eCapital Corp. placed Ms. Palmer's retired male predecessor, Mr. Joseph, on the ECC so that he, too, now had the authority to vote down any deal she approved.

159.    A particularly glaring example of how this structure undermined Ms. Palmer's authority was a deal that had the support of everyone on the ICC except for Mr. McGarry. Typically, Mr. McGarry presented deals to Mr. Howard for ECC approval but since he did not support the deal, Ms. Palmer asked Mr. Howard if she could present the deal to the ECC. Instead, Mr. Howard simply declined the deal by email.

160.    By contrast, Mr. McGarry had never been denied the opportunity to present to the ECC.

161.    After Mr. Howard's denial, Ms. Palmer and the other members of the ICC met with him to discuss the deal.  Subsequently, Mr. McGarry and Mr. Howard had several closed-door meetings about the deal, which they ultimately approved in Ms. Palmer's absence.

162.     Afterwards, Mr. McGarry made it known to Ms. Palmer that the deal was only approved because of him, further driving home how subordinate Ms. Palmer had become.

163.     As described above, access to the ECC, which approved certain deals, was crucial.  Even here, however, eCapital favored Mr. Cuttic.  For example, Mr. Howard dragged his feet and refused for more than a week to schedule a meeting with Ms. Palmer and a female member of the ICC so they could present a deal.  Yet Mr. Cuttic's group was able to get on Mr. Howard's calendar before the two women, even though he submitted his scheduling request after them.

164.     In the end, the two women had to resort to presenting the deal to Mr. Howard via email, even though such presentations are typically done by video conference.

165.     Although the deal was eventually approved, Mr. Howard diminished the female ICC member's contribution to the deal in an email to the ICC by giving credit to Mr. McGarry for "clearing up" her presentation.  The female ICC member later complained to Ms. Palmer that Mr. Howard giving credit to a man for her work was proof of eCapital Corp.'s "boys club" culture and that this was the second consecutive deal where her work was disrespected by male executives.

166.     Ms. Palmer elevated her female colleague's complaint to Mr. Sheppard.  To Ms. Palmer's knowledge, eCapital did little, if anything, to investigate, let alone remedy, this complaint.

167.     The Defendants' attempts to render Ms. Palmer invisible and instead highlight male executives continued after the rebranding.

168.     For example, Mr. Sheppard decreed that Ms. Palmer was not allowed to have a business card for the first month after the rebranding.  She was also not allowed to provide all

members of her team with business cards even though her male counterparts were provided with this basic marketing tool, and her team continued to collect business cards from others when attending industry events.

169.   In addition, before the rebrand ABL had a very strong social media presence, particularly on LinkedIn, with content featuring Ms. Palmer speaking about funding women-owned and -led businesses, explaining how to obtain finance and announcing new deals.  The LinkedIn page also redirected viewers to ABL's website, which hosted additional content, such as a podcast.

170.   After the rebrand, eCapital Corp. refused to let ABL establish a LinkedIn profile and for months after the rebrand ABL was also not allowed to have a landing page on eCapital Corp.'s website.  eCapital Corp. did, however, allow a male-led rebranded subsidiary to have a LinkedIn profile that linked to a landing page on eCapital Corp.'s website.[16]

171.   eCapital Corp. further attempted to erase Ms. Palmer by neglecting to feature her on its website from April 4, 2022, through mid-to-late June 2022, even though before the rebranding she was pictured alongside the CEOs of other eCapital Corp. subsidiaries.

172.   Furthermore, Ms. Palmer did not appear on the Company's Canadian leadership webpage even though she had a Canadian portfolio.

173.   In an additional attempt to keep Ms. Palmer in the background while pushing men to the forefront, Mr. Howard invited Ms. Palmer's male subordinate, Mr. McGarry – but not her – to meet the CEO of a new acquisition.  It was no wonder that Ms. Palmer's eCapital colleagues and industry contacts commented that she appeared to be "out of the market."

---

[16]    The entity formerly known as Advantedge was rebranded as eCapital Commercial Finance UK but was allowed to maintain a LinkedIn page containing a link to its own landing page on eCapital Corp.'s website.  See https://www.linkedin.com/company/ecapital-commercial-finance-ltd/ and https://ecapital.com/en-gb/.

174.    The Defendants also diminished Ms. Palmer's authority by decreasing the number of employees on her team.

175.    At the time ABL was rebranded, Ms. Palmer had 16 full-time employees.  In short order, eCapital Corp. gutted her team by moving the reporting line from Ms. Palmer to the parent company for twenty-five percent of those employees.[17]

176.    Ms. Palmer managed to temporarily stave off a change in reporting line away from her for three additional employees by finding them new roles at ABL but expected that at least one additional employee would be required to report to the parent company as well.

177.    In addition, eCapital Corp. offered to promote Mr. McGarry to the role of Chief Risk Officer of eCapital Corp.  As mentioned above, Mr. McGarry declined the promotion, but had he accepted, Ms. Palmer would have lost almost one third of her team.

178.    Not content to hollow out her team, eCapital has also stripped from Ms. Palmer the ultimate authority regarding numerous decisions for her business, including the final say on market messaging and even who her legal secretary would be.

179.    In the end, eCapital had done everything in its power to force Ms. Palmer out after she complained about its discriminatory and retaliatory conduct.

## V.    Defendants Terminate Ms. Palmer's Employment

180.    On September 8, 2022, Ms. Palmer filed an action in New York State court, alleging non-federal claims for discrimination and retaliation.

---

[17]    Ms. Palmer's Head of Marketing and two of her marketing directors reported to the parent company's Centralized Marketing Team.  Her Business Development officers were directed to report to the Centralized Sales Team and her Controller eventually reported into the Centralized Finance Team.

181. Pursuant to ABL's agreement with one of its lenders, Ms. Palmer was required to report to the lender any litigation that could have a "Material Adverse Effect" upon the operations of ABL's business, liabilities or condition.

182. In compliance with ABL's legal obligations, Ms. Palmer reported the existence of her lawsuit.

183. Defendants immediately lashed out at her. They instead wanted her to hide the lawsuit, in violation of ABL's legal obligations to the lender. Mr. Staebler chastised Ms. Palmer, claiming the disclosure was "unnecessary" and further advised her "to avoid any further communication about the lawsuit" with the lender "or anyone outside eCapital" absent further instruction from Mr. Sheppard or Mr. McDonald.

184. The following day, Ms. Palmer was instructed not to talk to anyone about her suit.

185. In late November 2022, Mr. Staebler directed that Ms. Palmer sign documents in connection with a refinancing deal that omitted any reference to Ms. Palmer's lawsuit. (Loan documents routinely request that the borrower – in this case, ABL – disclose pending lawsuits.) Ms. Palmer protested that eCapital Corp. and ABL could not hide the lawsuit from the lender. As a result, eCapital Corp. and ABL were forced to revise the lending documents.

186. Just a few days later, Defendants fired Ms. Palmer.

187. On December 1, 2022, Ms. Palmer received notice that she was to meet with Mr. Sheppard on December 5 to review her "budget," as was each division head.

188. The notice was a ruse. Ms. Palmer arrived at the meeting via video conference from New York. Mr. Sheppard did not show up. Rather, Jaime Gillespie (eCapital Corp.'s Chief Human Resources Officer) and Mr. Staebler arrived and told Ms. Palmer that eCapital made the decision to "eliminate" her role.

189.    This, too, was false.  That same day Mr. McDonald (eCapital Corp.'s President) and Mr. Neely (eCapital Corp.'s CFO), acting as members of ABL's board of directors, issued a resolution "remov[ing]" Ms. Palmer as ABL's CEO and replacing her with Mr. Cuttic.

190.    In anticipation of Ms. Palmer's termination, two eCapital executives, Mr. Sheppard and Mr. Howard, came to New York to inform ABL's staff that, among other things, Mr. Cuttic was replacing Ms. Palmer as CEO.

<u>**FIRST CAUSE OF ACTION**</u>
**(Discrimination in Violation of the NYSHRL)**
***Against Defendants eCapital Corp. and ABL***

191.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

192.    By the actions described above, among others, Defendants eCapital Corp. and ABL discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL.

193.    As a direct and proximate result of Defendants eCapital Corp. and ABL's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

194.    As a direct and proximate result of Defendants eCapital Corp. and ABL's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

195.    Defendants eCapital Corp. and ABL's unlawful actions constitute malicious, willful and wanton violations of the NYSHRL.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

196.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

197.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYSHRL.

198.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

199.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

200.    Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting Violation of the NYSHRL)
### *Against Defendants Silvasan, Staebler, McDonald and Neely*

201.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

202.    By the actions described above, among others, Defendants Silvasan, McDonald and Neely aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

203.    As a direct and proximate result of these Defendants' unlawful aiding and abetting in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

204.    As a direct and proximate result these Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

205.    These Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYSHRL.

### FOURTH CAUSE OF ACTION
**(Discrimination in Violation of NYCHRL)**
***Against All Defendants***

206.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

207.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL.

208.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm.

209.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

210.     Defendants' unlawful actions constitute malicious, willful and wanton violations of the NYCHRL.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
### *Against All Defendants*

211.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

212.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYCHRL.

213.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

214.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

215.     Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL.

## SIXTH CAUSE OF ACTION
### (Interference with Protected Rights in Violation of NYCHRL)
### *Against All Defendants*

216.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

217.     By the actions described above, among others, Defendants interfered with Plaintiff's rights as protected by the NYCHRL and in violation thereof.

218.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

219.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

220.     Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Violation of the NYCHRL)**
***Against Defendants Silvasan, Staebler, McDonald and Neely***

221.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

222.    By the actions described above, among others, Defendants Silvasan, McDonald and Neely aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

223.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

224.    These Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL.

## EIGHTH CAUSE OF ACTION
### (Violation of New York's Whistleblower Law)
### *Against All Defendants*

225.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

226.    Plaintiff disclosed an activity, policy or practice of the Defendants that she

reasonably believed was in violation of law, rule or regulation.

227.    Plaintiff also objected to such activity, policy or practice.

228.    As a result, Defendants took retaliatory action against Plaintiff.

229.    Defendants' retaliatory action was willful, malicious or wanton.

## NINTH CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Defendants eCapital Corp. and ABL*

230.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as

contained in each of the preceding paragraphs as if fully set forth herein.

231.    By the actions described above, among others, eCapital Corp. and ABL

discriminated against Plaintiff on the basis of her sex in violation of Title VII by, *inter alia*, by

denying her the same benefits, terms and conditions of employment as those which are provided

to men.

232.    eCapital Corp. and ABL's conduct has created, condoned, ratified and acquiesced

to a hostile work environment on account of Plaintiff's sex.

233.    As a direct and proximate result of eCapital Corp. and ABL's unlawful and

discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer,

harm for which she is entitled to an award of damages to the greatest extent permitted by law,

including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of money damages, in addition to reasonable attorneys' fees and costs.

234.     As a direct and proximate result of eCapital Corp. and ABL's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

235.     eCapital Corp. and ABL's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
#### (Retaliation in Violation of Title VII)
#### *Against Defendants eCapital Corp. and ABL*

236.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

237.     By the actions described above, among others, eCapital Corp. and ABL retaliated against Plaintiff for engaging in protected activity under the Title VII.

238.     As a direct and proximate result of eCapital Corp. and ABL's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

239.     eCapital Corp. and ABL's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.     A declaratory judgment that the actions of Defendants complained of herein violate the laws of the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.     An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.     An award of punitive damages, in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and,

H.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated:  May 16, 2023
      New York, New York                       Respectfully submitted,

                                              **WIGDOR LLP**

By: _____
                                      Valdi Licul
                                      Laura E. Edidin

                                  85 Fifth Avenue
                                  New York, NY 10003
                                  Telephone: (212) 257-6800
                                  Facsimile: (212) 257-6845
                                  vlicul@wigdorlaw.com
                                  ledidin@wigdorlaw.com

                                  *Attorneys for Plaintiff*