**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

JENNIFER PALMER,                                                  :
                                                                                :
                                                  Plaintiff,         :
                                                                                :
                        v.                                                    :
                                                                                :      Civil Action No.: 1:23-cv-04080
ECAPITAL, ECAPITAL ASSET BASED                          :
LENDING CORP. (formerly known as                         :
GERBER FINANCE INC.), MARIUS                              :
SILVASAN, JONATHAN STAEBLER,                            :
STEVEN McDONALD and CRIS NEELY, in               :
their individual and professional capacities,             :
                                                                                :
                                                  Defendants.     :
-------------------------------------------------------- X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

**WIGDOR LLP**

Valdi Licul
Monica Hincken

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
mhincken@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ....................................................................................................1

I.      BACKGROUND ..........................................................................................................1

II.     ECAPITAL ATTEMPTS TO FORCE PALMER OUT AND ELEVATE A MAN IN HER PLACE .............................................................................................................3

III.    PALMER PROTESTS DISCRIMINATION AND FACES RETALIATION...................4

IV.     DEFENDANTS TERMINATE PALMER'S EMPLOYMENT.........................................6

LEGAL ARGUEMENT ........................................................................................................7

I.      PERSONAL JURISDICTION.......................................................................................7

        A.      The Rule 12(b)(2) Standard .......................................................................7

        B.      CPLR 302(a)(1) ...........................................................................................7

        C.      CPLR 302(a)(3) ...........................................................................................9

        D.      The Exercise of Personal Jurisdiction Over the Individual Defendants Does Not Violate Due Process ..................................................................11

II.     STATING A CLAIM....................................................................................................13

        A.  Discrimination.................................................................................................14

        B.  Retaliation ......................................................................................................19

        C.  Whistleblowing...............................................................................................20

CONCLUSION....................................................................................................................22

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                            <u>**Pages**</u>

Abdu-Brisson v. Delta Air Lines, Inc.,
    239 F.3d 456 (2d Cir. 2001) ........................................................................................... 16

Arista Record, LLC v. Doe 3,
    605 F.3d  (2d Cir. 2010) ................................................................................................. 14

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ........................................................................................................ 14

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
    902 F.2d 194 (2d. Cir. 1990) ............................................................................................ 7

Bank Brussels Lambert v. Fidler Gonzalez & Rodriguez,
    305 F.3d 120 (2d Cir. 2002) ............................................................................................. 7

Banks v. General Motors,
    Inc., --- F.4th ---, 2023 WL 5761361 (2d Cir. Sept. 7, 2023) ......................................... 15, 20, 21

Bell Atl. Corp. v. Towmbly,
    550 U.S. 544 (2007) ........................................................................................................ 14

Best Van Lines, Inc. v. Walker,
    490 F.3d 239 (2d Cir. 2007) ............................................................................................. 8

Bierer v. Glaze, Inc.,
    2006 WL 2882569 (E.D.N.Y. Oct. 6, 2006) .................................................................... 13

Bonaffini v. City Univ. of N.Y.,
    No. 20 Civ. 5118 (BMC), 2021 WL 2895688 (E.D.N.Y. July 9, 2021) .................................. 19

Bostock v. Clayton County, Georgia,
    [--- U.S. ---, 140 S.Ct. 1731 (2020) ............................................................................... 20

Buon v. Spindler,
    65 F.4th 64 (2d Cir. 2023) ............................................................................................. 16, 18, 19

Burlington Northern and Santa Fe Ry. Co. v. White,
    548 U.S. 53 (2006) .......................................................................................................... 20

Chepak v. Metro. Hosp.,
    555 F. App'x 74 (2d Cir. 2014) ...................................................................................... 14

Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn.,
   555 U.S 271 (2009) ................................................................................................... 22

D'Anzieri v. Harrison Global LLC,
   No. 21 Civ. 8506 (VEC), 2022 WL 17404254 (S.D.N.Y. Dec. 2, 2022) ...................................... 9

Del Ponte by Del Ponte v. Universal City Dev. Partners, Ltd.,
   No. 7 Civ. 2360 (LMS), 2007 WL 9819187 (S.D.N.Y. July 13, 2007) ........................................ 10

Distefano v. Carozzi North America,
   286 F.3d 81 (2d Cir. 2001) ......................................................................................... 10

Doe v. Bloomberg, L.P.,
   36 N.Y.3d 450 (2021) ................................................................................................ 19

Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,
   722 F.3d 81 (2d Cir. 2013) .......................................................................................... 7

Eades v. Kennedy, PC Law,
   Offs., 799 F.3d 161 (2d Cir. 2015) ................................................................................ 8

Edwardo v. Roman Cath. Bishop of Providence,
   66 F.4th 69 (2d Cir. 2023) ........................................................................................... 8

Farmer v. Shake Shack Enterprises, LLC,
   473 F. Supp. 3d 309 (S.D.N.Y. 2020) .......................................................................... 22

Feingold v. New York,
   366 F.3d 138 (2d Cir. 2004) ...................................................................................... 19

Feinman v. Morgan Stanley Dean Witter,
   193 Misc. 2d 496 (Sup. Ct. 2002) .............................................................................. 23

Gross v. FBL Fin. Servs., Inc.,
   557 U.S. 167 (2009) ................................................................................................. 17

Hollins v. U.S. Tennis Ass'n,
   469 F. Supp. 2d 67 (E.D.N.Y. 2006) .......................................................................... 10

Hubbard v. Total Comm'ns, Inc.,
   347 F. App'x 679 (2d Cir. 2009) ................................................................................ 22

Int'l Shoe Co. v. State of Washington,
   326 U.S. 310 (1945) .................................................................................................11

iii

Kazolias v. IBEWLU 363,
    806 F.3d 45 (2d Cir. 2015) ............................................................................................ 21

Kreutter v. McFadden Oil Corp.,
    71 N.Y.2d 460 (1988) ................................................................................................... 8

Kumar v. Opera Sols. OPCO, LLC,
    No. 20 Civ. 6824 (GHW), 2021 WL 4442832 (S.D.N.Y. Sept. 28, 2021) ...................... 9, 12, 13

Launer v. Buena Vista Winery, Inc.,
    916 F. Supp. 204 (E.D.N.Y. 1996) ............................................................................... 10

Leshinsky v. Telvent GIT, S.A.,
    942 F. Supp. 2d 432 (S.D.N.Y. 2013)............................................................................ 16

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,
    732 F.3d 161 (2d Cir. 2013) ......................................................................................... 12

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015) ..................................................................................... 15, 22

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012)........................................................................... 22

McHenry v. Fox News Network, LLC,
    510 F. Supp. 3d 51 (S.D.N.Y. 2020).............................................................................. 15

Metro. Life Ins. Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996) ............................................................................................11

Mihalik v. Credit Agricole Cheuvreux, N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013) ..................................................................................... 15, 20

Mortg. Funding Corp. v. Boyer Lake Pointe, LC,
    379 F.Supp. 2d 282 (E.D.N.Y. 2005) ............................................................................ 8

Nielsen v. AECOM Tech. Corp.,
    762 F.3d 214 (2d Cir. 2014) .......................................................................................... 9

Pierre v. Gts Holdings, Inc.,
    No. 15 Civ. 143 (PAC), 2015 WL 7736552 (S.D.N.Y. Nov. 30, 2015)..................................... 13

Porina v. Marward Shipping Co., Ltd.,
    521 F.3d 122 (2d Cir. 2008) ..........................................................................................11

Ramiro Aviles v. S & P Glob., Inc.,
   380 F. Supp. 3d 221 (S.D.N.Y. 2019)............................................................................. 9

Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,
   450 F.3d 100 (2d Cir. 2006) ......................................................................................... 8

Stratton v. Dep't for the Aging for the City of N.Y.,
   132 F.3d 869 (2d Cir. 1997) ................................................................................... 16, 17

Taylor Devices, Inc. v. Walbridge Aldinger Co.,
   358 F. Supp. 2d 560 (W.D.N.Y. 2008) ......................................................................... 7

Terry v. Aschcroft,
   336 F.3d 128 (2d Cir. 2003) ....................................................................................... 18

Tolbert v. Smith,
   790 F.3d 427 (2d Cir. 2015) ....................................................................................... 18

Tomassi v. Insignia Fin. Grp., Inc.,
   478 F.3d 111 (2d Cir. 2007)........................................................................................ 17

Treglia v. Town of Manilus,
   313 F.3d 713 (2d Cir. 2002) ....................................................................................... 18

United States v. Burke,
   504 U.S. 229 (1992) .................................................................................................... 10

Vega v. Hempstead Union Free Sch. Dist.,
   801 F.3d 72 (2d Cir. 2015) .................................................................................... 15, 20

Vodopia v. Koninklijke Philips Elec., N.V.,
   398 F. App'x 659 (2d Cir. 2010) ................................................................................... 9

Walsh v. N.Y. City Hous. Auth.,
   828 F.3d 70 (2d Cir. 2016) ......................................................................................... 17

Webb-Weber v. Community Action for Human Services, Inc.,
   23 N.Y.3d 448 (2d. Cir. 2014) .................................................................................... 22

Winner v. Tryko Partners, LLC,
   333 F. Supp. 3d 250 (W.D.N.Y. 2018) .............................................................. 7, 9, 12

Zann Kwan v. Andalez Group,
   737 F.3d 834 (2d Cir. 2013) .............................................................................. 16, 20, 21

Zubulake v. UBS Warburg LLC.,
  382 F. Supp. 2d 536 (S.D.N.Y. 2005) .......................................................................... 17

**Statutes**

42 U.S.C. §§ 2000e ..................................................................................................... 14

N.Y. Exec. Law §§ 290 ............................................................................................... 14

**Rules**

CPLR 302 ........................................................................................................................ 9

CPLR 302(a)(1) ......................................................................................................... 8, 10

CPLR 302(a)(3) ........................................................................................................ 10, 11

Section 302(a) .............................................................................................................. 10

**Other Authorities**

2021 S.B. 4394 ............................................................................................................. 22

N.Y.C. Admin. Code § 8-107(19) ................................................................................ 21

N.Y.C. Admin. Code §§ 8-101 ..................................................................................... 14

## PRELIMINARY STATEMENT

Plaintiff Jennifer Palmer ("Plaintiff" or "Palmer") submits this Memorandum in Opposition to Defendants eCapital Corp., eCapital Asset Based Lending Corp.[1] ("ABL"), Marius Silvasan ("Silvasan"), Jonathan Staebler, Esq. ("Staebler"), Steven McDonald ("McDonald") and Cris Neely's ("Neely") (together, "Defendants") Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint with Prejudice ("Def. Mem."). For the following reasons, Palmer respectfully requests that Defendants' motion be denied in its entirety.

## STATEMENT OF FACTS

### I.   BACKGROUND

Palmer is an accomplished financial services executive who began working on the marketing team of ABL in 2006 and worked her way up to become the youngest and first female Chief Executive Officer ("CEO") in ABL's 20-year history.[2] Dkt. 1 ("Compl.") ¶¶ 28, 39. However, when Palmer became CEO, she was thrust into a male-dominated company where she was the only female CEO among eCapital's subsidiaries, and the parent company had only two women on its 12-person executive team. Id. ¶¶ 42-43. On December 9, 2019, Palmer's employment agreement was amended to reflect, among other things, her new role as President and CEO of ABL, which was wholly interconnected with eCapital. Id. ¶ 40. For instance:

- Palmer was required to "report" to Silvasan, who was the CEO of eCapital, ABL's "Parent";

- eCapital had authority to "review" and "increase" Palmer's salary;

---

[1]   For ease of reference, Palmer will refer to eCapital Corp. as "eCapital" and eCapital Asset Based Lending Corp. as ("ABL").

[2]   In 2017, ABL was acquired by Trade Finance Solutions, which subsequently changed its name to Global Merchant Fund Corp. and then ultimately to eCapital Compl. ¶ 31. eCapital's leadership, which consisted at the relevant time of Silvasan, eCapital CEO; McDonald, President; and Howard, Chief Credit and Portfolio Officer, traveled frequently to New York on behalf of eCapital as part of their due diligence in acquiring ABL. Id. ¶ 32.

- eCapital was required to maintain "director and officer liability insurance policies" for Palmer; and

- McDonald—eCapital's President and ABL's Vice President—signed the amended agreement. Id. ¶ 41.

Palmer excelled after her elevation to CEO, so much so that by 2021, ABL had its second most profitable year since its inception in 1996. Id. ¶¶ 44-45. Despite Palmer's success, however, the Defendants sought to diminish her work and accomplishments by subjecting her to a level of scrutiny that her male predecessor never faced even when there was attrition in ABL's book of business, questioning ABL's pipeline of clients, expressing doubt about her ability to grow the book of business, requiring her to provide Silvasan with weekly pipeline reports, and falsely predicting that ABL would not meet its immediate budget of booking $30 million to $35 million, which it did. Id. ¶¶ 47-54.

Silvasan continued to further diminish, undermine, and isolate Palmer by neglecting to inform her that eCapital's origination standards had changed to reflect a more conservative approach due to the pandemic, an approach that Ms. Palmer had previously recommended; routinely questioning credits proposed by Palmer or other female members of her team while regularly agreeing with feedback from male employees; forcing Palmer to fire ABL's longtime female outside counsel and work with a less-competent male outside counsel instead; routinely excluding Palmer from work-related conversations and dinners held with male executives; and repeatedly ignoring Palmer's emails while taking credit for her ideas. Id. ¶¶ 55-70.

eCapital's overall hostility toward women became even more evident when Palmer spoke to Silvasan about increasing the number of women-owned or women-led clients, and Silvasan warned Palmer not to increase her commitment to funding women in a way that "ostracized men." Id. ¶¶ 75-76. Silvasan then directly warned Palmer not to narrow ABL's business

2

exclusively to women-led businesses, and ordered her to continue to pitch and service men.  Id. ¶ 80.

As a result of her success, Palmer received considerable media attention, which angered eCapital.  Id. ¶ 71.  Indeed, in December 2021, Silvasan told a room full of male executives that he was concerned about press coverage focusing on Palmer's accomplishments and complained that there was a "cult-like following" surrounding her.  Id. ¶ 72.  Then, in February 2022, eCapital's Chief Marketing Officer told Palmer's team that going forward Silvasan and Charles Sheppard, Chief Product Officer ("CPO") and Chief Operating Officer ("COO"), would be the "face" of eCapital.  Id. ¶ 73.  Finally, during this same period, eCapital continued its campaign to render Palmer invisible by taking out two prominent ads in an industry trade publication to celebrate women leaders at eCapital but omitting her from both, despite Palmer appearing on the cover of that very issue and being quoted prominently in the lead article about her efforts to increase ABL's portfolio share of women-owned and -led companies to 50 percent.  Id. ¶ 74.

## II.   ECAPITAL ATTEMPTS TO FORCE PALMER OUT AND ELEVATE A MAN IN HER PLACE

In the Spring of 2021, Silvasan told Palmer that the parent company was considering rebranding ABL under the eCapital name but refused Palmer's request to take part in the rebranding conversations and ignored carefully crafted plans Palmer drafted in the event the rebranding moved forward.  Id. ¶¶ 83-87.  In June 2021, in the context of a discussion about Palmer's employment contract, Silvasan solicited Palmer's opinion on the rebranding and agreed with Palmer that the best course of action was for ABL to maintain an identity separate from eCapital.  Id. ¶¶ 87-90.  For the first time, Silvasan also told Palmer that he was interviewing a candidate to lead the parent company's asset-based lending group, and the following month Brian Cuttic ("Cuttic") was announced internally as Managing Director.  Id. ¶¶ 91-92.

3

Despite the conversation held in June 2021, in December 2021, Silvasan told Palmer that ABL would be re-branded under the eCapital name, and asked if Palmer would accept a demotion to co-CEO of the rebranded entity along with Cuttic.  Id. ¶¶ 96-97.  Palmer was shocked and protested the demotion, which resulted in Silvasan accusing Palmer of being "aggressive" and "confrontational" and informing her that she could quit if she was unwilling to accept the demotion.  Id. ¶¶ 98-100.  Silvasan's reaction was consistent with how he treated her throughout their working relationship—where he would have and did label male employees as being strong and assertive, he labeled Palmer with sexist stereotypes.  Id. ¶ 101.

On February 28, 2022, Palmer received a draft employment contract that listed her title as "CEO Asset-Based Lending," but, to Palmer's shock, when she met with Silvasan and Sheppard two days later, they presented her with a reorganization plan that listed her as co-CEO with Cuttic.  Id. ¶¶ 111, 113.  Palmer said she needed time to consider, given that it was clear that Silvasan was using the rebranding as an excuse to demote her and force a male co-CEO to take over responsibilities.  Id. ¶ 114.

Shortly thereafter, Palmer learned for the first time that despite her 16 years of experience at ABL, Cuttic, who had been with the company for a mere seven months, had more credit authority to book a new deal than she did, which effectively meant that while Palmer could approve a $2 million line of credit, Cuttic could approve a $3 million line.  Id. ¶¶ 116-118.

III.    **PALMER PROTESTS DISCRIMINATION AND FACES RETALIATION**

In March 2022, while in New York, Palmer emailed Silvasan with examples of the discrimination she faced; Silvasan responded by calling her "childish."  Two days later, Palmer, through her counsel, detailed the numerous instances of discrimination she faced and asserted her right to bring claims if the situation was not remedied.  Id. ¶¶ 116-118.  eCapital immediately

4

withdrew the employment agreement it had previously offered Palmer, replacing it with even worse terms and a transparent threat to sue Palmer if she pursued claims while also diminishing her responsibilities as CEO by requiring Palmer to comply with any future changes to the organizational structure of eCapital without first knowing what those changes would be.  This, of course, stripped Palmer of the ability to perform her fiduciary responsibilities as CEO by ensuring, for example, that any changes to the organizational structure were lawful.  Id. ¶¶ 122-125.  Upon information and belief, Palmer's male CEO colleagues were not required to sign contracts containing this provision.  Id. ¶ 127.

In April 2022, McDonald then emailed Palmer with an ultimatum that required her to sign the draft contract or be terminated from her position, and Palmer was left with no choice but to sign.  Id. ¶¶ 129-131.  Among other changes, the new agreement reaffirmed that ABL was centrally managed by eCapital.  Id. ¶ 132.

eCapital then limited Palmer's portfolio to deals in the narrow area of "wellness"—a stereotypically female industry—whereas all other ABL deals went to Cuttic.  Id. ¶¶ 141-142.  In addition, eCapital instituted inequitable staffing on the Internal Credit Committee ("ICC") and the External Credit Committee ("ECC") such that any deal of more than $2 million approved by two of the three ICC members consisting of Palmer; Joseph, former CEO; and Kevin McGarry ("McGarry"), ABL's Chief Credit Officer, would also have to be approved by the ECC comprised of McGarry and Howard.  Id. ¶ 154.  As a result, McGarry, Palmer's subordinate, had the power to vote down a deal she had approved.  Id. ¶ 155.  By contrast, Cuttic and one of his male colleagues could approve deals under $3 million without a third person, and the same was true for another male-led eCapital affiliate.  Id. ¶ 157.

eCapital further attempted to erase Palmer by neglecting to feature her on its website from April 4, 2022 through mid-to-late June 2022 (even though before the rebranding she was pictured alongside the CEOs of other eCapital subsidiaries); neglecting to include her on the Company's Canadian leadership webpage even though she had a Canadian portfolio; not including her in a meeting with the CEO of a new acquisition; and decreasing the number of employees on her team.  Id. ¶¶ 171-174.

## IV.    DEFENDANTS TERMINATE PALMER'S EMPLOYMENT

In September 2022, Palmer filed an action in New York State court, alleging non-federal claims for discrimination and retaliation.  Id. ¶ 180.  Pursuant to ABL's agreement with one of its lenders, she was required to report any litigation that could have a "Material Adverse Effect" upon the operations of ABL's business, liabilities or condition.  Id. ¶ 181.  In compliance with ABL's legal obligations, Palmer reported the existence of her lawsuit.  Id. ¶ 182.  Defendants immediately lashed out at her because they instead wanted her to hide the lawsuit, in violation of ABL's legal obligations to the lender.  Id. ¶ 183.  Staebler chastised Palmer, claiming the disclosure was "unnecessary" and further advised her "to avoid any further communication about the lawsuit" with the lender "or anyone outside eCapital" absent further instruction from Sheppard or McDonald.  Id.

The following day, Palmer was instructed not to talk to anyone about her suit.  Id. ¶ 184. In late November 2022, Staebler directed that Palmer sign documents in connection with a refinancing deal that omitted any reference to Palmer's lawsuit. (Loan documents routinely request that the borrower—in this case, ABL—disclose pending lawsuits.), which Palmer refused to do.  Id. ¶ 185.  As a result, eCapital and ABL were forced to revise the lending documents.  Id. Just a few days later, Defendants fired Palmer and replaced her with Cuttic as CEO.  Id. ¶ 186.

6

**LEGAL ARGUMENT**

I.      **PERSONAL JURISIDICTION**

    A.      **The Rule 12(b)(2) Standard**

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading, in good faith, legally sufficient allegations of jurisdiction." Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d. Cir. 1990)).  "If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." Id.  In such circumstances, "the pleadings and affidavits are construed, and any ambiguity resolved, in favor of the plaintiff." Winner v. Tryko Partners, LLC, 333 F. Supp. 3d 250, 258 (W.D.N.Y. 2018) (quoting Taylor Devices, Inc. v. Walbridge Aldinger Co., 358 F. Supp. 2d 560, 575 (W.D.N.Y. 2008)).

Determining whether a court has personal jurisdiction over the defendants, "requires a two-step analysis." Bank Brussels Lambert v. Fidler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).  "First, the court must determine if New York would confer upon its courts the jurisdiction to reach the defendant." Id.  If so, "the court must then determine whether New York's extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment." Id.

    B.      **CPLR 302(a)(1)**

CPLR 302(a)(1) provides for personal jurisdiction over a defendant who (1) "transacts any business" in New York and (2) the claims "aris[e] from" the transaction of that business. Eades v. Kennedy, PC Law Offs., 799 F.3d 161, 168 (2d Cir. 2015).  A defendant transacts

7

business in the state by engaging in "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the state, thus invoking the benefits and protections of its laws." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007). Even "one transaction in New York is sufficient to invoke jurisdiction, even though [a] defendant never enters New York." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 468 (1988). A claim arises from the transaction of business "when there is 'some articulable nexus between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" Edwardo v. Roman Cath. Bishop of Providence, 66 F.4th 69, 76 (2d Cir. 2023) (quoting Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006)).

Here, there can be little doubt that eCapital transacted business in New York. Palmer worked in New York, where she was the CEO of ABL, a business unit operated by eCapital. Compl. at ¶¶ 19, 132. Plaintiff reported to eCapital's executives, including Silvasan, who had the authority to, among other things, determine Plaintiff's compensation. Id. at ¶ 41. eCapital and the individual defendants first unlawfully demoted Plaintiff and, ultimately, fired and replaced her with a less qualified man. Id. at ¶¶ 113-114, 126, 188-190. These allegations easily make out "a *prima facie* showing of jurisdiction." Mortg. Funding Corp. v. Boyer Lake Pointe, LC, 379 F.Supp. 2d 282, 285 (E.D.N.Y. 2005).

Moreover, Palmer's "claims of discrimination would appear to 'relate' to her employment, which was contemplated to, and did, occur in New York." Winner, 333 F. Supp. 3d at 260. Indeed, "[c]ourts have repeatedly found that discrimination arises from an out-of-state defendant's business in New York when the Defendant knowingly 'supervise[s] or communicate[s] with an employee working remotely from New York,' and the defendant's

communications to the employee 'allegedly constitute[] acts of discrimination.'" D'Anzieri v. Harrison Global LLC, No. 21 Civ. 8506 (VEC), 2022 WL 17404254, at *4 (S.D.N.Y. Dec. 2, 2022) (quoting Kumar v. Opera Sols. OPCO, LLC, No. 20 Civ. 6824 (GHW), 2021 WL 4442832, at *8 (S.D.N.Y. Sept. 28, 2021)); see Vodopia v. Koninklijke Philips Elec., N.V., 398 F. App'x 659, 661 (2d Cir. 2010) (quoting CPLR 302) ("the allegations in [Plaintff's] complaint . . . establish specific jurisdiction because they make clear that this suit 'arises from' [Defendant's] 'transaction of business with the state'—specifically its employment of [Plaintiff]") (abrogated on other grounds by Nielsen v. AECOM Tech. Corp., 762 F.3d 214 (2d Cir. 2014)). Here, at all times when the individual defendants communicated with Palmer over email, telephone and/or video conferencing, including when Palmer was demoted and terminated, the Defendants were aware that she was located in and working in New York. Indeed, Palmer's employment contract required her to work from the New York office.

Moreover, "[u]nder New York law, if a corporation has sufficient in-state contacts to fall subject to personal jurisdiction, then a corporate officer who has 'played a part in the [corporate] activities that gave rise to the action' is likewise subject to jurisdiction, to the extent that due process permits, due to the agency relationship between the corporation and the officer." Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp. 3d 221, 261 (S.D.N.Y. 2019).

Accordingly, both the corporate and individual defendants are subject to personal jurisdiction under CPLR 302(a)(1).

C.      **CPLR 302(a)(3)**

Under CPLR 302(a)(3), a court can exercise specific personal jurisdiction over a defendant where "(1) the [d]efendant's commission of a tort outside of New York State caused injury to the [p]laintiff within New York State, and (2) the [d]efendant either regularly does or

9

solicits business in New York, engages in any other persistent course of conduct in New York, or derives substantial revenue from goods used or consumed or services rendered in New York." Del Ponte by Del Ponte v. Universal City Dev. Partners, Ltd., No. 7 Civ. 2360 (LMS), 2007 WL 9819187, at *3 (S.D.N.Y. July 13, 2007).

With respect to the first prong, "[i]t is undisputed that [the] alleged discriminatory acts constitute torts within the meaning of section 302(a)." Hollins v. U.S. Tennis Ass'n, 469 F. Supp. 2d 67, 77 (E.D.N.Y. 2006); see also Launer v. Buena Vista Winery, Inc., 916 F. Supp. 204, 210 (E.D.N.Y. 1996) (citing United States v. Burke, 504 U.S. 229 (1992)) (holding "acts of discrimination are often considered to be civil rights violations which have been found to be torts"). As a result, a defendant's physical presence in the forum is immaterial if the injury was felt by the plaintiff in New York, and it is, therefore, irrelevant whether the individual defendants were present in New York when they demoted and/or terminated her. See Distefano v. Carozzi North America, 286 F.3d 81, 85 (2d Cir. 2001) ("we hold that since DiStefano's employment took place in New York, the 'original event which caused the injury' occurred in New York"); id. ("the 'original event" is DiStefano's experience of being removed from his job").

With respect to the second prong, the individual defendants regularly conducted business in New York state, both in person and otherwise. In addition to maintaining a physical office space and staff in New York, the individual defendants not only personally conducted work from the New York office while physically in New York state on several occasions, they also regularly attended in-person meetings in New York, and engaged in substantial video conferencing, telephone and email contact with both Palmer and other New York-based employees. See Declaration of Jennifer Palmer ("Palmer Decl.") ¶ 2. Further, eCapital derives substantial income from ABL. For example, ABL revenue and profits get rolled up to eCapital;

10

ABL pays $500,000 in management fees to eCapital, and ABL paid for marketing and technology services that eCapital required ABL to use.  Id. at ¶ 3.  It is indisputable that Defendants regularly conducted business in New York in addition to deriving substantial revenue from services rendered in New York.

Accordingly, this Court has personal jurisdiction under CPLR 302(a)(3).

**D.      The Exercise of Personal Jurisdiction Over the Individual Defendants Does Not Violate Due Process**

"Due process permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not 'offend traditional notions of fair play and substantial justice.'"  Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008) (quoting Int'l Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945)).  The due process inquiry requires "a two-step analysis."  Id.  First, the court must decide whether the individual defendants have "sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction."  Id.  Second, if it does, the court considers "whether the assertion of personal jurisdiction 'is reasonable under the circumstances of the particular case.'"  Id. (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996)).

Here, there is little question that the individual defendants undeniably transact business within the state insofar as they run and operate an office in New York.  Palmer worked in New York as the CEO of ABL, a business unit operated by eCapital.  Compl. ¶¶ 19, 132.  Plaintiff reported to eCapital's executives, including Silvasan, who had the authority to, among other things, determine Plaintiff's compensation.  Id. ¶ 41.  Thus, the individual defendants purposefully availed themselves of Palmer's work as CEO of ABL, and knew at all times that the work was being performed for their benefit from New York.  Further, the individual defendants not only worked from and attended meetings in the New York office on several occasions, but

11

they also engaged in a substantial number of emails, telephone calls, and video conferences with Palmer while she was working in New York.  See Palmer Decl. ¶ 2.

Under any reasonable analysis, the individual defendants have sufficient minimum contacts with the forum and have "purposefully availed [themselves] of the privilege of doing business in [New York] and could foresee being haled into court there."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013).

Moreover, it is not unreasonable for this Court to assert personal jurisdiction over the Defendants.  In making this determination, courts consider the following factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. Winner 333 F. Supp. 3d at 264.

Using this test, the court in Kumar v. Opera Solutions OPCO, LLC, No. 20 Civ. 6824 (GHW), 2021 WL 4442832 (S.D.N.Y. Sept. 28, 2021), held that due process was satisfied where the "communications" by the non-domiciled defendants with the New York based employee were "deliberate," and they knew "those communications would be received in New York State, and that effects of these communications would be felt there." Id. at 10.  For these reasons, and because some of the communications were connected to the plaintiff's employment discrimination claims, the court found that defendants "had fair warning that their continuous communications with [Plaintiff] could expose them to liability in New York." Id. at 10.  Here, as in Kumar, the defendants maintained deliberate communications with Palmer while she was employed in New York at an office operated by eCapital.  In addition, given that Defendants

12

traveled to New York for in-person meetings and other reasons during Palmer's employment, under no set of circumstances can they claim that it would be a burden to litigate before this Court when they have purposefully and regularly done business in New York.

Finally, Palmer is a New York resident.  Both the state and the city have a strong interest in protecting their resident employees and enforcing compliance with their respective anti-discrimination statutes.  See e.g., Bierer v. Glaze, Inc., 2006 WL 2882569, *8 (E.D.N.Y. Oct. 6, 2006) ("New York has a strong interest in protecting its citizens from unfair treatment by their employers."); Pierre v. Gts Holdings, Inc., No. 15 Civ. 143 (PAC), 2015 WL 7736552, at *4 (S.D.N.Y. Nov. 30, 2015) (New York has a great interest in applying its labor laws uniformly to employers who enjoy the many benefits of conducting substantial business in the state).

In balancing these factors, all interests weigh in favor of applying the laws designed and enacted to protect New York employees such as Palmer in a New York court.

## II.   STATING A CLAIM

A plaintiff states a claim where she pleads "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Towmbly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged.  The plausibility standard is not to a 'probability requires,' but it asks more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted).  The standard is one of "flexible plausibility," "requiring a pleader to amplify her complaint with sufficient factual allegations to 'nudge [her] claims across the line from conceivable to plausible.'"  Chepak v. Metro. Hosp., 555 F. App'x 74, 76 (2d Cir. 2014) (quoting Twombly, 550 U.S. at 570).

When reviewing a motion to dismiss, a court must "assume [the] veracity" of the allegations set forth, draw all "reasonable inference[s]" in the plaintiff's favor, and use its "judicial experience and common sense" to conduct a "context-specific" analysis of the complaint.  Ashcroft, 556 U.S. at 678-79.  The plaintiff is not required to plead "specific evidence" explaining precisely how the defendant's conduct was unlawful, Arista Record, LLC v. Doe 3, 605 F.3d 199, 119-21 (2d Cir. 2010), but only facts sufficient to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  Twombly, 550 U.S. at 555 (internal citations omitted).

## A.      Discrimination

Federal and local laws prohibit discrimination based on sex.  See Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.  An employer violates federal law where sex was "a motivating factor for any employment practice."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015).  The employer (and individual executives involved in the adverse actions) violate state and city laws where they treated the employee "less well, at least in part for a discriminatory reason."  Mihalik v. Credit Agricole Cheuvreux, N. Am., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013) (emphasis added).[3]

In employment cases, a plaintiff is "not required to plead a prima facie case of discrimination" in her complaint.  Vega, 801 F.3d at 84.  Nor is she even required to "give plausible support to the ultimate question of whether the adverse employment action was

---

[3]      On August 12, 2019, the state law was amended to conform to the liberal standards of the city law.  McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).

14

attributable to discrimination." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). She "need only give plausible support to a minimal inference of discrimination." Id. Importantly, the Second Circuit has recognized that "clever men may easily conceal their motivations," and that "[d]ue to the 'elusive' nature of intentional discrimination, plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'" Banks v. General Motors, Inc., --- F.4th ---, 2023 WL 5761361, at *7 (2d Cir. Sept. 7, 2023) (quoting Vega, 801 F.3d at 86)). Plaintiff has more than carried this burden.

First, "an inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." Littlejohn v. City of New York, 795 F.3d 297, 312-13 (2d Cir. 2015). Here, Defendants stripped most responsibilities from Palmer, gave them to a man and then fired her in favor of the man. Id. at ¶¶ 141-143, 188-189.[4]

Second, pretext is "powerful evidence" of unlawful conduct. Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 879 (2d Cir. 1997) (quotations omitted). Thus, an employee can prove discrimination "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate non-[discriminatory] reasons for its actions. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for the prohibited reason." Zann Kwan v. Andalez Group, 737 F.3d 834, 846 (2d Cir. 2013). Here, Defendants told Plaintiff that her job was eliminated. Compl. at

---

[4] Defendants challenge, among other things, whether Palmer's male replacement was similarly situated. Def. Mem. 18. But that is a dispute for another day. See Buon v. Spindler, 65 F.4th 64, 85 n.7 (2d Cir. 2023) ("Buon's allegations that the individuals who secured each of the three positions at issue were both outside her protected class and less qualified are sufficient for the Title VII claim to survive a motion to dismiss").

15

¶ 188.  In fact, internal documents show that they replaced her with a man.  Id. at ¶ 189.
Defendants now claim that Plaintiff was fired for poor performance.  Dkt. 26 at p. 3.  Such
shifting explanations are classic proof of pretext.  Leshinsky v. Telvent GIT, S.A., 942 F. Supp.
2d 432, 449 (S.D.N.Y. 2013).

Third, "disparate treatment is the essence of discrimination."  Abdu-Brisson v. Delta Air
Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).  The Complaint here is replete with examples of
Defendants treating Plaintiff less well than her male peers.  For instance, they interrogated
Plaintiff about work but not her male counterparts, Compl. at ¶ 53; undermined Plaintiff by
going around her to her male predecessor, id. at ¶ 67; appointed a male executive to "babysit"
her, id, at ¶ 141; excluded Plaintiff from work events, while inviting male peers, including
Plaintiff's male subordinate, id. at ¶¶ 68, 173; routinely ignored Plaintiff's ideas, id. at ¶ 86;
required that men—not Plaintiff—be the "face" of eCapital, id. at ¶¶ 72-73; diminished
Plaintiff's work advancing women so as not to "ostracize men", id. at ¶ 77; provided Plaintiff
with less capital to book deals than her male peers, id. at ¶ 116; and limited Plaintiff to work in
the "wellness" industry (a stereotypically female business) while, of course, reserving oil and gas
deals (a stereotypically "manly" industry) for men, id. at ¶ 142, FN 15.

Fourth, an employer's demographics can also provide evidence of discrimination.  Walsh
v. N.Y. City Hous. Auth., 828 F.3d 70, 77 (2d Cir. 2016); see Stratton, 132 F.3d at 877 (utilizing
demographic information "to support a claim of discrimination even in a disparate treatment case
involving a single plaintiff").  Here, eCapital's leadership team is made up almost entirely of
men.  Id. at ¶¶ 32, 93.

Fifth, an employer's mistreatment of "other employees" is "relevant to the issue of the
employer's discriminatory intent."  Zubulake v. UBS Warburg LLC., 382 F. Supp. 2d 536, 544

16

(S.D.N.Y. 2005).  Here, another female employee complained about the "boys' club" atmosphere where men were getting credit for her work.  Compl. at ¶ 165.  In addition, Silvasan directed the firing of female outside counsel, ultimately replacing at least one with a man.  Id. at ¶¶ 59-64.

Sixth, discriminatory statements are powerful proof of discrimination.  Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  "The relevant of discrimination-related remarks does not demand on their offensiveness, but rather on their tendency to show that a decision-maker was motivated by assumptions or attitudes relating to the protected class."  Id. at 116.  "The more a remark evinces a discriminatory state of mind, the more probative the remark will be."  Id. at 115.  Importantly, a plaintiff "need not show that the [decision-maker] declared that [the adverse action] was tied" to the employee's protected status.  Tolbert v. Smith, 790 F.3d 427, 438 (2d Cir. 2015).  "Statements showing the employer's bias" are sufficient.  Id.

Here, Plaintiff was accused of being "aggressive" and "confrontational" when she advocated for herself.  Compl. at ¶ 100.  Men, of course, were not stereotyped in this way even when they argued with Silvasan.  Id. at ¶ 101.  Moreover, Plaintiff was degraded with sex-specific insults, being called "one of those girls" and "real bitch," and was told that Defendants were "hiring a search firm for you," presumably to replace her, which, of course, they eventually did.  Id. at ¶ 105.

Defendants' wrongly argue that Palmer's claims are "barred by the same actor inference."  Def. Mem. 14.  As a threshold matter, the Second Circuit has never determined whether the inference applies in non-age discrimination cases.  Buon, 65 F.4th at 85.  Regardless, whatever utility the inference may have at a fact-finding stage of an age discrimination case, "it

17

should not be used to foreclose Title VII . . . claims at the motion-to-dismiss stage if the plaintiff has otherwise set forth allegations that support a plausible inference of discrimination." Id.

Defendants further argue that "the only cognizable adverse employment action alleged in the Complaint is that her job was eliminated." Def. Mem. 16. But they are wrong. "The category of employment decisions that constitute adverse actions is 'broad' in scope." Banks, 2023 WL 576136l, at *16 (quoting Treglia v. Town of Manilus, 313 F.3d 713, 720 (2d Cir. 2002)). "Examples of adverse actions include 'termination of employment, a demotion as evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Terry v. Aschcroft, 336 F.3d 128, 138 (2d Cir. 2003). "[E]conomic harm is not required for an employment decision to be actionable under Title VII, and even an "internal transfer[] may also qualify as an adverse employment action." Id.

Here, there can be no doubt that Palmer suffered an adverse employment action other than simply being dismissed. In December 2021, Defendants proposed to demote her to co-CEO of ABL (Compl. ¶ 97) and, after she protested the demotion (Id. ¶ 99), they instead made her CEO of ABL in name only, stripping away most of her business duties, leaving her with only responsibilities for "wellness" companies. Id. ¶¶ 141-143).

Finally, contrary to Defendants' argument, the individual defendants can be held liable for discrimination (and retaliation). The city statute "imposes primary liability on employees," Doe v. Bloomberg, L.P., 36 N.Y.3d 450, 459 (2021). Moreover, "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' can be held individually liable as an aider and abettor" under the state and city laws. Bonaffini v. City Univ. of N.Y., No. 20

18

Civ. 5118 (BMC), 2021 WL 2895688, at *2 (E.D.N.Y. July 9, 2021) (quoting Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004)).

### B.    Retaliation

Federal and local laws "prohibit an employer from discriminating an employee because the employee has engaged in protected activity." Banks, 2023 WL 5761361, at *20. For retaliation purposes, an action is adverse where "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)). Under federal law, an employer is liable where the employee's protected activity was the "but-for cause" of the adverse action. Id. (quoting Vega, 801 F.3d at 90). "As the Supreme Court recently made clear in Bostock v. Clayton County, Georgia, [590 U.S. ---, 140 S.Ct. 1731, 1739 (2020)], in addressing a discrimination claim, however, there can be more than one 'but-for' cause of an adverse employment action." Id. Indeed, "there can be "multiple 'but-for' causes, each one of which may be sufficient to support liability." Zann Kwan, 737 F.3d at 846. Under the state and city laws, however, an employer is liable if "retaliation played any role" in the adverse acts. Mihalik, 715 F.3d at 116 (2d Cir. 2013).

Here, Palmer engaged in several instances of protected activity. On March 17, 2022, she complained internally about discrimination, Compl. ¶ 119, and on March 24, 2022, she sent a letter complaining of discrimination through counsel. Id. at ¶ 121. Defendants "immediately" withdrew her pending employment agreement and replaced it with one that was less favorable, threatening to fire her if she did not sign it. Id. at ¶¶ 122-32. Next, on September 8, 2022, Palmer filed a discrimination lawsuit. Id. at ¶ 180. On December 1, 2022, after 16 years of service and less than three months after Palmer sued for discrimination, Defendants fired her.

19

This "close temporal relationship" easily sets forth a claim of retaliation. Banks, 2023 WL 5761361, at *22; see id. ("we have previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action"); id. (citing cases where "four months" and "eight months" established causation).

Moreover, as explained above, Defendants' asserted reasons for terminating Palmer's employment is wholly pretextual. See Zann Kwan, 737 F.3d at 847 (evidence of pretext and close temporal proximity between an employee's complaints of discrimination and termination "are sufficient to create a triable issue of fact" as to retaliation).

Finally, Defendants were clearly angry that Plaintiff raised discrimination claims, shaming her as "childish," another classic indication of retaliation. Id. at ¶¶ 119-120. See Kazolias v. IBEWLU 363, 806 F.3d 45, 49-50 (2d Cir. 2015) (decisionmaker's expressed resentment of plaintiffs' claims could show "retaliatory animus against Plaintiffs for their complaints" and a jury could infer that such resentment "had been brewing ever since [plaintiffs] brought their age discrimination charges" five months prior).

For the same reasons, Defendants unlawfully interfered with Palmer's rights in violation of the city law. The city law makes it unlawful "for any person to coerce, intimidate, threaten or interfere with . . . any person in the exercise or enjoyment . . . of any right granted or protected" by the statute. N.Y.C. Admin. Code § 8-107(19). Here, Defendants threatened to terminate Palmer's employment if she did not sign their revised and retaliatory employment agreement.

### C.    **Whistleblowing**

Labor Law § 740(2)(a) prohibits an employer from "tak[ing] any retaliatory action against an employee" because the employee "discloses, or threatens to disclose to a supervisor . . . an activity, policy or practice of the employer that the employee reasonably believes is in

20

violation of law, rule or regulation." A "'[r]etaliatory action' means an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in any manner discriminate against any employee" for engaging in protected activity, including, "but not limited to, discharge, suspension or demotion," or taking action "that would adversely impact a former employee's current or future employment." Labor Law § 740(1)(d). To prevail, a plaintiff need not "specify the actual law, rule or regulation violated." Webb-Weber v. Community Action for Human Services, Inc., 23 N.Y.3d 448, 453 (2d Cir. 2014). She need only "identify the particular activities, policies or practices in which the employer engaged." Id.

Protected activity is not limited to formal protests. Hubbard v. Total Comm'ns, Inc., 347 F. App'x 679, 680 (2d Cir. 2009). Rather, any expression or disapproval is protected. Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn., 555 U.S. 271, 276 (2009). "[A]ny activity designed to 'resist or antagonize. . .; to contend against; to confront; resist; [or] withstand'. . . constitutes a protected oppositional activity." Littlejohn, 795 F.3d at 317 (quoting Crawford, 555 U.S. 271, 276 (2009). Moreover, no "magic words" are required. Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012); see Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 331 (S.D.N.Y. 2020) ("When an employee communicates to her employer a belief that the employer has engaged in [unlawful activity], . . . that communication *virtually always* constitutes the employee's opposition to the activity.") (quoting Littlejohn, 795 F.3d at 317) (emphasis in original). Accordingly, under § 740, it is "sufficient that an employee establish that he/she reasonably believed that the employer was violating the law, not that the law was actually violated." NY Spons. Memo, 2021 S.B. 4394.

Here, Defendants fired Palmer shortly after she protested that Defendants were trying to hide the existence of her lawsuit from lenders. Palmer believed, in good faith, that Defendants

21

were acting in violation of their "legal obligations to lenders." Compl. ¶ 183. That is sufficient to allege a plausible claim.[5]

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court dismiss Defendants' motion in its entirety.

Dated: September 27, 2023
         New York, New York

Respectfully submitted,

WIGDOR LLP

By: _____
         Valdi Licul
         Monica Hincken

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
mhincken@wigdorlaw.com

*Attorney for Plaintiff*

---

[5] Defendants cite <u>Feinman v. Morgan Stanley Dean Witter</u>, 193 Misc. 2d 496, 497 (Sup. Ct. 2002), for the proposition that Palmer "cannot rest her federal and local antidiscrimination claims on the identical allegations used for her NYLL § 740 claim." Def. Mem. 21. But Labor Law § 740 has since been amended and no longer contains an election of remedies provision. To the contrary, the amended statute, which became effective January 26, 2022, expressly states, in relevant part, that nothing in the statute "shall be deemed to diminish the rights, privileges, or remedies of any employee under any other law or regulation." Labor Law § 740(7).

22