UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER PALMER,

               Plaintiff,

       v.

ECAPITAL CORP., et al.,

               Defendants.

23 Civ. 4080 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

    Plaintiff Jennifer Palmer ("Plaintiff" or "Palmer"), brings suit against Defendants

eCapital Corp. ("eCapital"); eCapital Asset Based Lending Corp. ("ABL"); Marius Silvasan

("Silvasan"); Jonathan Staebler ("Staebler"); Steve McDonald ("McDonald"); and Cris Neely

("Neely"),[1] alleging sex-based employment discrimination under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the New York State Human Rights Law,

N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").  *See generally* Am. Compl., ECF No. 57.

Plaintiff additionally brings claims for interference with her protected rights under NYCHRL

§ 8-107(19) and for Defendants' alleged violation of New York Labor Law § 740 ("NY

whistleblower law").  *See id.*  Before the Court is Defendants' Rule 12(b)(2) and 12(b)(6) motion

to dismiss the Amended Complaint.[2]  ECF No. 61.  For the reasons discussed herein,

Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Silvasan, Staebler, McDonald, and Neely are referred to as the "Individual Defendants" and, together with eCapital, the "Foreign Defendants."  All Defendants collectively are referred to as the "Defendants."

[2] All references to Rules are to the Federal Rules of Civil Procedure.

## BACKGROUND

"The following facts are drawn from the [amended] complaint and are assumed to be true for the purposes of this motion." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 228 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs*., No. 22 Civ. 2763, 2023 WL 3882977 (2d Cir. June 8, 2023).[3]

### A.  The Parties

Defendant ABL is a financial services company incorporated in New York.  Am. Compl. ¶¶ 21, 28.  In 2017, Defendant eCapital acquired ABL.  *Id.* ¶ 31.  eCapital is the parent company of ABL, and "owns 100 percent of ABL."  *Id.* ¶¶ 20, 35.  It is incorporated in Florida.  *Id.* ¶ 20. ABL and eCapital are "wholly interconnected."  *Id.* ¶ 49.  "ABL receives funding through eCapital Corp., and ABL's sole investor and shareholder is eCapital."  *Id.* ¶ 37.  "ABL is required to use the shared services provided by eCapital Corp., including marketing, IT, legal and sales"; and "the HR department that services ABL is within eCapital Corp."  *Id.* ¶ 38.

During the relevant period, Plaintiff was the Chief Executive Officer ("CEO") of ABL and a resident of New York.  *See id.* ¶¶ 3, 19.  Plaintiff had been hired by ABL in 2006 and previously worked on its marketing team, serving as its Senior Vice President.  *Id.* ¶¶ 28-29.  On December 9, 2019, Plaintiff's title changed from President to CEO of ABL, and she "stepped into the CEO role on January 1, 2020."  *See id.* ¶¶ 48, 60.  eCapital, as ABL's parent company, had authority to review and increase Plaintiff's salary during her employment.  *Id.* ¶ 49.  Plaintiff "was the only female CEO among eCapital Corp.'s subsidiaries."  *Id.* ¶ 51.  "In a little more than two years, Ms. Palmer grew ABL's asset-based portfolio by more than 140%."  *Id.* ¶ 53. Plaintiff was terminated on or around December 5, 2022.  *Id.* ¶ 11.

---

[3] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

Defendant Silvasan is the CEO of eCapital and a resident of Florida, to whom Palmer reported. *Id.* ¶¶ 22, 49-a.  Defendant Staebler is the General Counsel of eCapital and a resident of Florida.  *Id.* ¶ 23.  Defendant McDonald is the President of eCapital, Vice President of ABL, a member of ABL's board of directors, and a resident of Canada.  *Id.* ¶ 24.  Defendant Neely is the Chief Financial Officer of eCapital, a member of the Board of Directors of ABL, and a resident of Florida.  *Id.* ¶ 25.  Individual Defendants "occasionally worked from ABL's New York offices."  *Id.* ¶ 44 ("Mr. Silvasan, Mr. McDonald, Mr. Howard *and other eCapital executives and employees* also occasionally worked from ABL's New York offices.") (emphasis added).

### B.  Alleged Disparate Treatment

Plaintiff alleges instances of disparate treatment as compared to her male colleagues.

First, Plaintiff alleges that she was disparately treated as compared to Gerald Joseph ("Joseph"), her male predecessor who had "served as ABL's CEO for three years with eCapital Corp. as its parent."  *Id.* ¶¶ 56, 57.  Palmer was "exposed to a level of scrutiny to which . . . Joseph had never been subjected."  *Id.* ¶ 56.  For example, Joseph was trusted to "run[] the company" even "when there was attrition in ABL's book of business" under his tenure.  *Id.* ¶¶ 58-59.  By contrast, when Plaintiff took over as CEO, Silvasan "question[ed] ABL's portfolio size," "express[ed] doubt about Ms. Palmer's ability to grow the book of business," and "for the first time since ABL was acquired in 2017, requir[ed] that [Plaintiff, as CEO,] provide him with weekly pipeline reports."  *Id.* ¶ 61.  While Silvasan "accus[ed] Ms. Palmer of being 'aggressive' and 'confrontational,'" *id.* ¶ 108, he "never called Mr. Joseph 'aggressive' or 'confrontational,'" notwithstanding that Joseph "frequently lost his temper with Mr. Silvasan."  *Id.* ¶ 109.

Second, Plaintiff alleges that she was disparately treated as compared to Brian Cuttic ("Cuttic"), a male colleague who was initially Managing Director of eCapital's asset-based lending group, and who eventually replaced her as the CEO of ABL.  *Id.* ¶¶ 100, 127, 200.

When Cuttic's and Plaintiff's employment overlapped, Cuttic "had more credit authority to book a new deal than [Plaintiff] did." *Id.* ¶ 124. "In practice, this meant that during the two-person approval process, Ms. Palmer could only approve a $2 million line of credit, but Mr. Cuttic could approve a $3 million line." *Id.* ¶ 125. "This was the case even though Ms. Palmer had 16 years of experience at ABL, five of those working with shareholders under eCapital Corp., compared to Mr. Cuttic[,] who had been with eCapital Corp. for a mere seven months." *Id.* ¶ 126. When Plaintiff and another female colleague sought to present a deal to the male Chief Credit and Portfolio Officer of eCapital, Cuttic was allowed "to get on [his] calendar before the two women, even though [Cuttic] submitted his scheduling request after them." *Id.* ¶ 171.

Third, Plaintiff alleges that she was disparately treated as compared to male colleagues more generally. For example, Silvasan "frequently agreed with the feedback provided by men from ABL but routinely questioned credit[] [advice] proposed by Ms. Palmer or other female members of her team." *Id*. ¶ 66. On a business trip to New York, Silvasan "invited male executives to dinner but excluded Ms. Palmer." *Id.* ¶ 76. The Chief Marketing Officer of eCapital informed Plaintiff that two men, and not she, "would be the 'face' of eCapital." *Id.* ¶ 81. Palmer was presented with an employment contract that forced her to "comply with any future changes to the organizational structure of eCapital Corp. or ABL without first knowing what those changes would be," while her male CEO colleagues at other eCapital subsidiaries were not. *Id.* ¶¶ 132, 135. Plaintiff's male subordinate was invited to meet the CEO of a new acquisition, while Plaintiff was not. *See id.* ¶ 181. When Plaintiff elevated a complaint from a female colleague about "eCapital Corp.'s 'boys club' culture," "eCapital did little, if anything, to investigate, let alone remedy" the matter. *Id.* ¶¶ 173-174.

Plaintiff alleges other instances of discriminatory treatment. For example, "[i]n December 2021, Mr. Silvasan told a room full of male executives that he was concerned about

press coverage focusing on Ms. Palmer's accomplishments and complained that there was a "cult-like following" surrounding her." *Id.* ¶ 80. Silvasan further warned Plaintiff "not to increase her commitment to funding women in a way that 'ostracized men.'" *Id.* ¶ 85. "He ordered her not to narrow ABL's business exclusively to women-led businesses." *Id.* ¶ 88. Shortly thereafter, at a work holiday party, Silvasan's wife called Plaintiff "one of *those* girls," and "[a] real bitch." *Id.* ¶ 113 (emphasis in original).

### C. Plaintiff's Internal Complaints of Discrimination and Aftermath

On March 17, 2022, "Palmer emailed Mr. Silvasan from New York, confronting him with examples of the discrimination she had faced." *Id.* ¶ 127. "Silvasan responded by calling her 'childish.'" *Id.* ¶ 128. "On March 24, 2022, Ms. Palmer, through her New York counsel, detailed in writing the numerous ways in which she had been discriminated against and asserted her right to bring claims if the situation was not remedied." *Id.* ¶ 129.

#### 1. Defendants Amend Plaintiff's Contract

After Plaintiff complained about discrimination, "eCapital immediately withdrew the employment agreement it had previously offered to Ms. Palmer [as part of a contract renewal process], replacing it with even worse terms." *Id.* ¶ 130. For example, while "the withdrawn agreement included a standard indemnification provision that required ABL to defend, indemnify and hold Ms. Palmer harmless from all claims relating to her work for or with ABL," the amended "agreement carved out an exception to indemnification for any claim brought against Ms. Palmer *by eCapital*," which Plaintiff construed as "a clear message threatening to sue Ms. Palmer if she asserted her rights." *Id.* ¶ 131 (emphasis in original). On April 14, 2022, Defendant McDonald informed Plaintiff that if she "decline[d] to sign the [amended] draft contract now in your hands, then after April 30, 2022 you will no longer be [sic] have an employment contract and, thus, no longer be employed by eCapital ABL." *Id.* ¶ 137.

### 2. Defendants Alter Plaintiff's Role

Also after Plaintiff complained about discrimination, eCapital "stripped Ms. Palmer of signing authority" to approve financial statements, instead "authorizing someone else (a non-CEO) to sign the financial statements." *Id.* ¶ 146. "When Ms. Palmer protested that these actions were a form of retaliation," Silvasan called her comments "non-sense [sic]" and declined to conduct "any investigation into Ms. Palmer's claims." *Id.* ¶¶ 147-148.

While Defendants "methodically diminished Ms. Palmer's authority as CEO," they "elevated Mr. Cuttic." *Id.* ¶ 149. "eCapital limited Ms. Palmer's portfolio to deals in the narrow area of 'wellness' – a stereotypically female industry – whereas all other ABL deals went to Mr. Cuttic." *Id.* ¶ 150. Accordingly, Plaintiff was required to "'hand off'" to Cuttic "a $25 million deal on which she had been working." *Id.* ¶ 158. "Furthermore, Ms. Palmer was expected with limited exceptions to refer to Mr. Cuttic any deals that she generated outside of the wellness space without credit for those deals counting towards her division's performance/net profits, thereby reducing her earning potential." *Id.* ¶ 155. When Palmer asked that her portfolio "be expanded to industries outside of wellness," eCapital's Chief Product Officer "laughed at her." *See id.* ¶¶ 81, 153. "Defendants also diminished Ms. Palmer's authority by decreasing the number of employees on her team." *Id.* ¶ 182.

### D. Plaintiff's State Court Complaint and Aftermath

"On September 8, 2022, Ms. Palmer filed an action in New York State court, alleging non-federal claims for discrimination and retaliation." *Id.* ¶ 188. Immediately thereafter, "[m]embers of the executive team . . . expressed how angry they were that Ms. Palmer filed her lawsuit." *Id.* ¶ 189. For example, Defendant Neely "expressed that he was 'pissed off' that Ms. Palmer sued him." *Id.*

Plaintiff notified an ABL lender of her lawsuit. *Id.* ¶¶ 190-191. "Defendants immediately lashed out at her" for doing so and, "[t]he following day, Ms. Palmer was instructed not to talk to anyone about her suit." *Id.* ¶¶ 192-193.

In late November 2022, Defendant Staebler directed Plaintiff to sign documents in connection with a refinancing deal. *Id.* ¶ 194. The document did not mention Plaintiff's lawsuit. *Id.* Plaintiff "protested that eCapital Corp. and ABL could not hide the lawsuit from the lender," and Defendants revised the documents. *Id.* "Just a few days later," on or around December 5, 2022, "Defendants fired Ms. Palmer." *Id.* ¶¶ 11, 195-197. Defendants McDonald and Neely, "acting as members of ABL's board of directors, issued a resolution" that removed Plaintiff "as ABL's CEO and replac[ed] her with Mr. Cuttic." *Id.* ¶ 199.

## DISCUSSION

### I. Personal Jurisdiction

#### A. Legal Standards

Plaintiffs opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction "ha[ve] the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695, 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003). To meet this burden at the motion to dismiss stage, plaintiffs must plead facts that are legally sufficient for a showing of jurisdiction. *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). While the Court must construe all of a plaintiff's allegations as true and resolve all inferences in the plaintiff's favor, *see Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008), plaintiffs cannot meet their burden at the motion to dismiss stage simply by relying on "conclusory statements without any supporting facts," *see Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014).

To determine whether it may exercise personal jurisdiction over non-domiciliary defendants, the Court must engage in a two-step analysis. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163-64 (2d Cir. 2010). First, the Court must ask whether New York's long-arm statute, N.Y. C.P.L.R. § 302, permits the exercise of specific personal jurisdiction over the defendant. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004). Second, if personal jurisdiction is permissible under the long-arm statute, then the Court must ensure that its exercise of personal jurisdiction "comports with the Due Process Clause of the United States Constitution." *See Chloé*, 616 F.3d at 164. This Due Process analysis asks whether the defendant has sufficient "minimum contacts" with the forum state to justify the exercise of specific personal jurisdiction and whether exercising jurisdiction over the particular defendant aligns with "traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

As relevant to this case, § 302(a)(1) of the long-arm statute allows courts to exercise personal jurisdiction over defendants who are not domiciled in New York where that defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). The Court must determine "(1) whether the defendant 'transacts any business' in New York, and, if so, (2) whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).

As to the first prong, "a defendant need not be physically present in New York to transact business there . . . as long as he engages in [p]urposeful activities or volitional acts through which he avails [him]self of the privilege of conducting activities within the . . . State, thus invoking the benefits and protections of its laws." *Allstar Mktg. Grp. v. andnov73*, No. 20 Civ. 9069, 2023 WL 5208008, at *2 (S.D.N.Y. Aug. 14, 2023) (citing *Chloé*, 616 F.3d at 169); *see also Fischbarg v. Doucet*, 880 N.E.2d 22 (N.Y. 2007) (same). "In determining whether a

defendant is purposefully transacting business in the state, the court must look at the quality of the defendant's New York contacts." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015). Thus, for example, where the "plaintiff attempt[s] to establish personal jurisdiction over a defendant who has never been present in the state and only acted through subsidiaries or agents," the plaintiff need only show "[1] that the subsidiary engaged in purposeful activities in this State, [2] that those activities were for the benefit of and with the knowledge and consent of the defendant, and [3] that the defendant exercised some control over the subsidiary in the matter that is the subject of the lawsuit." *Id.* Where a party communicates in order to "effectuate some purposeful business in New York," personal jurisdiction under § 302(a)(1) may be asserted over that party, even if the party "never entered the state." *Pickett v. Migos Touring, Inc.*, 420 F. Supp. 3d 197, 204 (S.D.N.Y. 2019).

As to the second prong, a claim "aris[es] from" a particular transaction within the meaning of § 302(a)(1) "when there is some articulable nexus between [the] business transacted and the cause of action sued upon." *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006). This "does not require a causal link," but rather requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013).

Under § 302(a)(1), an exercise of personal jurisdiction over a corporate defendant can be extended to reach individual corporate officers, provided that the plaintiff shows that the corporation "engaged in purposeful activities in [New York] in relation to [Plaintiff's] transaction for the benefit of and with the knowledge and consent of the individual defendant." *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 261 (S.D.N.Y. 2019). Stated differently, a court may only assert personal jurisdiction over an individual corporate officer

9

under § 302(a)(1) based on the in-state activities of the corporate defendant where the individual

officer "play[ed] a part in the activities that give rise to the action." *Id.*

### B. Application

Plaintiff argues that the Court's exercise of personal jurisdiction over Foreign Defendants

would be appropriate under N.Y. C.P.L.R. §§ 302(a)(1) and/or 302(a)(3).[4]  *See* Pl.'s Opp'n to

Defs.' Mot. to Dismiss ("Pl.'s Opp'n") 10 13, ECF No. 68.  Because the Court concludes that the

exercise of personal jurisdiction over Foreign Defendants is permissible under § 302(a)(1), it

does not address Plaintiff's alternative argument for asserting personal jurisdiction under

§ 302(a)(3).  *See Pearson Educ., Inc. v. ABC Books, LLC*, No. 19 Civ. 7642, 2020 WL 3547217,

at *4 (S.D.N.Y. June 30, 2020) ("Because the Court concludes that personal jurisdiction is

proper under § 302(a)(1), it need not determine whether it would also be proper under

§ 302(a)(3).").  The Court additionally determines that its exercise of personal jurisdiction

comports with the Due Process Clause.  It therefore denies Defendants' Rule 12(b)(2) motion.

---

[4] Plaintiff also states—only once and without legal argument—that "eCapital's daily management of ABL and conduct within the state are more than sufficient to establish *general* jurisdiction."  Pl.'s Opp'n 11 (emphasis added).  In opposing Defendants' 12(b)(2) motion, she argues only that the Court has *specific* jurisdiction under New York's long-arm statute.  *See id.* at 10-16 (citing only C.P.L.R. § 302 as the basis of the Court's jurisdiction).  Because Plaintiff only raises claims arising out of Defendants' contacts with the State of New York, and because the Court determines that it has specific jurisdiction, it limits its discussion to an analysis of its specific jurisdiction over the Foreign Defendants.

### 1. New York's Long-Arm Statute

**eCapital**. "Personal jurisdiction over a parent corporation whose subsidiary has transacted business in New York exists when the nondomiciliary parent corporation knew of and consented to the acts of its in-state subsidiary that gave rise to the cause of action, and 'exercised some control over [the subsidiary] in the matter.'" *EFCO Corp. v. Nortek, Inc.*, No. 99 Civ. 76602, 2000 WL 254047, at *1 (2d Cir. Mar. 6, 2000). Here, eCapital transacted business in New York through ABL, its New York-based subsidiary. *See* Am. Compl. ¶ 8. Defendants describe this allegation as "conclusory," and argue that Plaintiff frequently conflates eCapital with ABL. Defs.' Reply in Further Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply") 2, 4-5, ECF No. 69. But Plaintiff alleges more. eCapital funds ABL as its sole investor and shareholder while requiring ABL to use its shared services and exerting control over its operations. *Id.* ¶¶ 37-38, 41, 178, 183. eCapital employs individuals in New York. *See id.* ¶¶ 39, 46. And Plaintiff's termination and replacement were implemented with the knowledge, consent, and at the direction of eCapital. *Id.* ¶ 198. Based on these alleged facts, the Court determines that eCapital "has engaged in sufficient purposeful activity in the state to conclude that it has 'transacted business' for the purposes of section 302(a)(1)." *Ingenito*, 89 F. Supp. 3d at 478. Furthermore, Plaintiff easily alleges facts demonstrating that this case "arises from" eCapital's transaction of business through ABL, as eCapital had at least some control over ABL, including the decision to terminate Plaintiff, and thus "should have had fair warning of the possibility of being haled into court in New York." *Id.* Accordingly, the Court may properly assert personal jurisdiction over eCapital pursuant to § 302(a)(1) of New York's long-arm statute.

**Individual Foreign Defendants**. Defendants contend that "Plaintiff does not allege each Individual Defendant engaged in sustained and substantial business transactions in NY or exerted the necessary supervision and control" sufficient for personal jurisdiction. Reply 3. But

throughout her pleadings, Plaintiff details numerous instances in which the Individual Foreign Defendants conducted business in New York. Plaintiff was the CEO of ABL, an eCapital subsidiary located in New York. Am. Compl. ¶ 1. From New York, Plaintiff communicated frequently with the Individual Foreign Defendants. *See id.* ¶¶ 41, 104, 127, 129, 140-a, 153, 197. The Individual Foreign Defendants traveled to New York to conduct business, including announcing Plaintiff's termination and replacement. *See id.* ¶¶ 40, 44, 46, 76, 200. Defendants argue that at least some of these allegations are "false," Reply 2, and attaches declarations to that effect, but a court must accept a plaintiff's allegations as true on a motion to dismiss. And, as alleged, these activities satisfy the Court's personal jurisdiction requirements under § 302(a)(1).

Additionally, Plaintiff's allegations of employment discrimination have an "articulable nexus" with the Individual Foreign Defendants' business transactions in New York, *see Solé Resort*, 450 F.3d at 103, as Plaintiff alleges that the Individual Foreign Defendants were responsible for creating or enabling the conditions of her unfavorable treatment. For example, Plaintiff alleges that Silvasan was responsible for demoting her, *see* Am. Compl. ¶ 10; that McDonald pressured Plaintiff into signing an allegedly discriminatory and retaliatory contract, *see id.* ¶ 137; that Staebler refused to allow Plaintiff to seek outside advice when she felt she was being discriminated and retaliated against, *see id.* ¶ 141; and that Neely joined a resolution removing Plaintiff and promoting a male replacement, *id.* ¶ 199. Plaintiff therefore alleges discrete instances in which the Individual Foreign Defendants played a part in the allegedly discriminatory conduct, and their communications with Plaintiff—whether via email, call, or in person—constitute the effectuation of "some purposeful business in New York." *See Pickett*, 420 F. Supp. 3d at 204. Accordingly, the Court may properly assert personal jurisdiction over the Individual Foreign Defendants pursuant to § 302(a)(1) of New York's long-arm statute.

### 2. Due Process Clause

Before the Court concludes that it may exercise personal jurisdiction over Defendants, it must assure itself that doing so comports with the Due Process Clause. *See Chloé*, 616 F.3d at 164 (describing this as the second step in the personal jurisdiction analysis). This inquiry asks whether the non-domiciliary defendant has sufficient "minimum contacts" with New York, such that the court's exercise of personal jurisdiction does not "offend traditional notions of fair play and substantial justice." *See Int'l Shoe Co.*, 326 U.S. at 316.

While there are theoretically cases in which personal jurisdiction could be permissible under § 302(a)(1) of New York's long-arm statute yet prohibited by the Due Process Clause, the Second Circuit has cautioned that it "would expect such cases to be rare." *Licci*, 732 F.3d at 170 (noting further that the court was aware of "no such decisions"). This case does not present one of those rare exceptions, and Defendants do not argue as much. Accepting Plaintiff's pleadings as true for the purposes of deciding this motion, Foreign Defendants have conducted business in New York, including with the New-York based Plaintiff. They therefore have had sufficient "minimum contacts" with New York for the exercise of personal jurisdiction over them to comport with the Due Process Clause. *See Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 127 (S.D.N.Y. 2020) ("This purposeful availment of the privilege [of] doing business in New York with a New York resident is sufficient to establish minimum contacts under the Due Process Clause.").

## II.    Rule 12(b)(6) Motion

The Court begins its discussion with the legal standards applicable to each of Plaintiff's Rule 12(b)(6) claims.

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the

plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  A court may not dismiss claims unless the plaintiff has failed to plead facts sufficient to state a claim to relief that is facially plausible.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed."  *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### A. Employment Discrimination

Taking the allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has plausibly alleged federal, state, and city employment discrimination claims.

### 1.  Title VII (Count IX)[5]

#### a.  Legal Standards

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  Where, as here, the plaintiff does not purport to present "direct evidence of discrimination" but instead relies on circumstantial evidence of intent, her complaint must instead "be plausibly supported by facts alleged in the complaint [] that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).  "Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal." *Collins v. N.Y.C. Transit Auth.,* 305 F.3d 113, 118 (2d Cir. 2002).

When this motion was filed, courts in this Circuit held that to allege the third element, an adverse employment action, a plaintiff was required to have endured some "*materially significant disadvantage* with respect to the terms of the plaintiff's employment." *Littlejohn*, 795 F.3d at 311 n.10 (emphasis in original).  "But the landscape has changed with the Supreme Court's decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024*).*" *Anderson v. Amazon.com, Inc*., No. 23 Civ. 8347, 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024).  In that case, the Supreme Court resolved a Circuit split and rejected decisions of various Courts of Appeals—including the Second Circuit's—that required plaintiffs to allege "materially significant" employment actions. *See Muldrow*, 144 S. Ct. at 973 n.1, 974.  Instead, employment

---

[5] Courts apply the same standards in Title VII cases as in cases brought under 42 U.S.C. § 1981. *See Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 69 (2d Cir. 2000).  Accordingly, throughout its analysis of Plaintiff's federal claims, the Court cites both Title VII and Section 1981 caselaw.

discrimination plaintiffs need only allege "some harm respecting an identifiable term or condition of employment," but that harm need not be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 974.

As for the fourth element, a minimal inference of discriminatory intent can arise from a variety of circumstances, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312.

### b. Application

It is undisputed that Plaintiff is a member of a protected class and that she was qualified for her position.  And there can be no doubt that at the very least, Plaintiff's termination was an adverse employment action.  *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (describing termination as an example of an adverse employment action).  Having determined that Plaintiff has successfully alleged at least one viable adverse employment action, the Court next considers whether there is "at least minimal support for the proposition that [Defendants were] motivated by discriminatory intent" in terminating her.  *Littlejohn*, 795 F.3d at 311.

"[A]n inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312-13. Here, Plaintiff alleges that she was constructively demoted in favor of Cuttic, a white male who was less qualified for the role of CEO of ABL.  *See* Am. Compl. ¶¶ 149-151 (stating facts in support of Plaintiff's allegation that Plaintiff's role was diminished as Cuttic's was elevated); *id.* ¶ 126 (stating that Plaintiff had sixteen years of experience at ABL, while Cuttic had seven months of experience working for eCapital).  And after Defendants terminated Plaintiff, they

replaced her with Cuttic.  *See id.* ¶¶ 199-200.  At this early stage of the litigation, such factual

allegations are "sufficient to make plausible [Plaintiff's] claim that her [termination] occurred

under circumstances giving rise to an inference of discrimination."  *Littlejohn*, 795 F.3d at 313

(further noting that where a plaintiff "alleges that she was replaced by [an employee outside her

protected group]" who "was less qualified for the position," the plaintiff raised an inference of

discrimination sufficient to survive dismissal).

Defendants do not dispute that Plaintiff was replaced as the CEO of ABL by Cuttic.  *See*

*generally* Mem. of L. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Br."), ECF No. 65.  Instead,

they primarily argue that Plaintiff fails to allege a prima facie case of discrimination, because

"[t]he only adverse action Plaintiff suffered was elimination of her job based solely on legitimate

business decisions."  *See* Defs.' Br. 1-2, 14, 15, 16-17.  But on a motion to dismiss, the Court

construes facts alleged by Plaintiff, not by Defendants, as true.  *See Cooper*, 629 F. Supp. 3d at

228.  And nowhere in the Complaint does Plaintiff make allegations indicating that legitimate

business decisions justified her termination.  *Cf. Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d

Cir. 2011) (determining that the court was "not obliged to credit [the plaintiff's] assertion that

[the defendant] lacked a legitimate motive for [its actions]" in narrow circumstances where the

plaintiff "*admit*[*ted*] *in the complaint itself* that during the relevant time period," she could not

"perform the essential functions of her job" (emphasis added)).  At most, Defendants' assertion

raises a question of fact regarding their true motive(s) for terminating Plaintiff.  Such questions

are inappropriate to resolve at this stage.  *Noriega v. Abbott Lab'ys*, No. 23 Civ. 4014, 2024 WL

402925, at *3 (S.D.N.Y. Feb. 2, 2024) ("[G]enerally[,] a question of fact [is] not suited for

resolution at the motion to dismiss stage.").  Accordingly, Plaintiff's Title VII employment

discrimination claim survives dismissal.

### 2.  NYSHRL and NYCHRL (Counts I, IV)

#### a.  Legal Standard

Under the NYCHRL and NYSHRL,[6] "[t]he plaintiff need not prove any adverse

employment action; instead, [she] must prove that something happened that would be reasonably

likely to deter a person from engaging in protected activity."  *Benzinger v. Lukoil Pan Americas,*

*LLC*, 447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020).  Where, as here, the plaintiff relies on

circumstantial evidence, she must show that similarly situated comparator employees "were

treated better than the plaintiff was."  *Wilson v. JP Morgan Chase Bank, N.A.*, No. 20 Civ. 4558,

2021 WL 5179914, at *5 (S.D.N.Y. Nov. 8, 2021); *see also Mihalik v. Credit Agricole*

*Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (holding that a plaintiff need only

show that she was treated "less well" because of her employer's discriminatory intent).  Under

the NYCHRL, even a single discriminatory comment made by an employer may be actionable.

*See Mihalik*, 715 F.3d at 113.

#### b.  Application

Because Plaintiff has adequately alleged a Title VII claim of employment discrimination,

her parallel claims under the NYSHRL and the NYCHRL also withstand the motion to dismiss.

*See Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020) ("Because

[the plaintiff] has adequately pled sex-discrimination claims under Title VII . . . her similar claim

---

[6] In 2019, the New York State Legislature amended the NYSHRL to direct courts to construe it, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed."  N.Y. Exec. L. § 300. "[C]ourts agree that the amendments do not apply retroactively."  *Europe v. Equinox Holdings, Inc*., No. 20 Civ. 7787, 2022 WL 4124763, at *7 n.10 (S.D.N.Y. Sept. 9, 2022); *see also Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).  Here, all of Plaintiff's claims accrued after 2019.  Accordingly, the Court assesses Plaintiff's NYSHRL and NYCHRL claims together.

under the broader NYCHRL also necessarily survives."); *see also Mihalik*, 715 F.3d at 109 (The NYCHRL must be construed as a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a *floor* below which the City's Human Rights law cannot fall." (emphasis in original)). Accordingly, Defendants' motion to dismiss these claims is denied.

## B. Retaliation

Taking the allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has plausibly alleged federal, state, and city retaliation claims.

### 1. Title VII (Count X)

#### a. Legal Standards

To plausibly allege a federal retaliation claim, "a plaintiff must show: (i) [she] engaged in protected activity; (ii) the defendant was aware of that activity; (iii) [plaintiff] suffered a[n] . . . adverse [employment] action; and (iv) there was a causal connection between the protected activity and that adverse action." *Livingston*, 563 F. Supp. 3d at 245.

As relevant to this case, "protected activity" includes "oppos[ing] any practice made an unlawful employment practice by Title VII, or . . . participat[ing] in any manner in an investigation, proceeding, or hearing under Title VII." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011). Informal complaints to managers will only qualify as "protected activities" within this definition where the complaints are "sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). In the context of a Title VII retaliation claim, an adverse employment action is an action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Kessler v.*

*Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006); *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (same).  Finally, Title VII requires an allegation of "but-for" causation.  That is, a plaintiff bringing a Title VII retaliation claim must allege that "the adverse action would not have occurred in the absence of the [employer's] retaliatory motive." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).  This causation element "may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity."  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).  The "allegations in the complaint need only give plausible support to the reduced prima facie requirements" "in the initial phase of" litigation.  *Littlejohn*, 795 F.3d at 316.

### b. Application

Plaintiff engaged in a protected activity when she complained of unlawful discriminatory treatment internally with the assistance of counsel, *see* Am. Compl. ¶¶ 127-129, as well as when she filed suit in state court, *see id.* ¶ 188.  It was to Silvasan that she raised her internal complaints, and Defendants do not claim that they were not aware of Plaintiff's state action.  *See generally* Defs.' Br.  Defendants aver that Plaintiff's complaints "were made in bad faith at convenient times to serve her interest."  Reply 9.  But there is nothing on the face of the Complaint—which, again, the Court must accept as true at this stage of the litigation—that would allow the Court to conclude that Plaintiff did not act in good faith.

"[I]mmediately" after Plaintiff raised her complaints of discrimination, eCapital "withdrew the employment agreement it had previously offered to Ms. Palmer, replacing it with [a contract with] even worse terms and a transparent threat to sue Ms. Palmer if she pursued [her] claims."  *See* Am. Compl. ¶¶ 129-131.  A little more than a month after Plaintiff's protected activity, "eCapital limited Ms. Palmer's portfolio to deals in the narrow area of 'wellness'" while "all other ABL deals went to Mr. Cuttic," a limitation which had the effect of "reducing

[Plaintiff's] earning potential." *Id.* ¶¶ 150, 153, 155. Shortly thereafter, "Defendants also diminished Ms. Palmer's authority by decreasing the number of employees on her team." *Id.* ¶ 182. Finally, around three months after Plaintiff filed suit in state court, Plaintiff was fired. *See id.* ¶¶ 188, 195-196.[7] "[E]ach of these actions '*could* well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 91 (emphasis in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

Moreover, "each of these actions closely followed protected activity by [Plaintiff]." *Id.* at 92. For an inference of discrimination to be plausible based on temporal proximity, courts "uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). That is the case here. While Defendants argue that the complained-of conduct was "too conclusory and temporally remote" to sustain a claim, Reply 10, Defendants' actions occurred immediately (or at most, around three months) after Plaintiff's protected activities. "Some of [Defendants'] actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to

---

[7] Plaintiff filed suit in state court against ABL, eCapital, and Silvasan on September 8, 2022. Swergold Decl. Ex. B, ECF No. 62-2. *See Auriemma v. Exxonmobil Oil Corp.*, No. 21 Civ. 5508, 2023 WL 6389755, at *3 (E.D.N.Y. Sept. 30, 2023) (explaining that courts may take judicial notice of publicly filed complaints in deciding motion to dismiss). On or around December 5, 2022, Plaintiff was terminated. Am. Compl. ¶¶ 11, 195-196. In February 2023, Plaintiff filed an amended complaint in state court that added Defendants Staebler, McDonald, and Neely as parties to the suit. *See* Swergold Decl. Ex. D, ECF No. 62-4. Defendants contend that "Plaintiff's allegation [that] she was terminated because she sued Neely and McDonald is a factual impossibility because Plaintiff did not sue either individual until *after* her termination took place." Reply 8 (emphasis in original). Defendants do not appear to take issue with the fact that Staebler, too, was not named in Plaintiff's original pleadings in state court. At any rate, Defendants' argument is unavailing. That Neely and McDonald were not named specifically in Plaintiff's original state court complaint does not change the facts that eCapital terminated Plaintiff around three months after she filed her employment discrimination claim against it in state court, that Neely and McDonald were executives at eCapital, and that Neely and McDonald had issued the board resolution replacing Plaintiff with Cuttic. *See* Am. Compl. ¶ 199.

punish [Plaintiff] for complaining of discrimination." *Vega*, 801 F.3d at 92.  Thus, Plaintiff's Title VII retaliation claim survives dismissal.

### 2.  NYSHRL and NYCHRL (Counts II, V)

#### a.  Legal Standards

As under the federal standard, "[t]o establish a *prima facie* case of retaliation under the NYCHRL [and post-amendment NYSHRL], a plaintiff must show that: (1) [s]he participated in a protected activity; (2) the defendant knew about h[er] participation; (3) the defendant took an employment action that disadvantaged the plaintiff *in any manner;* and (4) a causal connection existed between the protected activity and the negative employment action." *Fattoruso v. Hilton Grand Vacations Co.*, 525 F. App'x 26, 27 (2d Cir. 2013) (emphasis in original).

Retaliation claims brought under the NYSHRL and NYCHRL need not allege a formal "adverse employment action."  *See Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 446 (S.D.N.Y. 2011).  Rather, an employee need only allege that her employer engaged in conduct that was "reasonably likely to deter a person from engaging in protected activity."  *See Maynard v. Montefiore Med. Ctr.*, No. 18 Civ. 8877, 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021). Even under the state and city provisions' broad standards, however, a plaintiff alleging retaliation "still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action."  *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018).

#### b.  Application

"Because the plaintiff has adequately alleged a Title VII claim of retaliation, her parallel retaliation claims under the NYSHRL and the NYCHRL also withstand the motion to dismiss." *Samuels v. City of New York*, No. 22 Civ. 1904, 2023 WL 5717892, at *14 (S.D.N.Y. Sept. 5, 2023); *Craven v. City of New York*, No. 19 Civ. 1486, 2020 WL 2765694, at *7 (S.D.N.Y. May

28, 2020) (denying motion to dismiss NYSHRL and NYCHRL retaliation claims after concluding that plaintiff stated a claim under Title VII standards).

### C. Aiding and Abetting (Counts III, VII)

Plaintiff alleges that Silvasan, McDonald, and Neely aided and abetted the discrimination and retaliation to which she was subjected, in violation of the NYSHRL and NYCHRL.  Am. Compl. ¶¶ 212, 232.  For the reasons discussed herein, the Court concludes that Plaintiff's claims survive dismissal.

#### 1. Legal Standards

The same standard governs aiding and abetting claims under the NYSHRL and NYCHRL "because the language of the two laws is virtually identical."  *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).  "The aider and abettor need not have had an employer-employee or supervisory relationship with the plaintiff."  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).  Rather, he need only have (1) "actually participate[d] in the conduct giving rise to the discrimination," *Feingold*, 366 F.3d at 157, and (2) "share[d] the intent or purpose of the principal actor."  *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308, 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011).

#### 2. Application

As discussed in the previous sections, the Amended Complaint "is replete with allegations that [Individual Defendants] 'actually participated' in the alleged unlawful conduct," and therefore "may be held liable" under the NYSHRL and NYCHRL.  *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 425-26, 427 (E.D.N.Y. 2008).  Defendants argue that there can be no aiding and abetting liability here because Plaintiff alleges that the "Individual Defendants are the primary actors" in her discriminatory treatment.  Reply 11. Although Defendants cannot aid or abet their own conduct, *see Malena v. Victoria's Secret*

23

*Direct, LLC*, 886 F. Supp. 2d 349, 367 & n.7 (S.D.N.Y. 2012), Plaintiff has sufficiently alleged

that a combination of Silvasan's, McDonald's, and Neely's conduct resulted in her disparate

treatment and retaliatory termination.[8]  Accordingly, at least at this early stage of the litigation,

Plaintiff has plausibly alleged that Defendants have, as eCapital employees who participated in

the actionable conduct, aided and abetted discriminatory and retaliatory acts against Plaintiff.

*See, e.g.*, *Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 338 (S.D.N.Y. 2020) (holding an

employee liable for participating in discrimination and noting that even where any particular

individual defendant's "actions are the main factual basis for the [institutional defendants']

alleged liability, [] the law does not prohibit him from being held liable as an aider and abetter *of*

*his employer*." (emphasis added)); *see also Tully-Boone*, 588 F. Supp. 2d at 427 (holding that

where the "complaint is replete with allegations that [an individual defendant] actually

participated in the alleged unlawful conduct, . . . the Plaintiff has adequately pled that she may be

held liable as an aider and abetter under [the NYSHRL]").

### D.  Interference with Protected Rights (Count VI)

Plaintiff alleges that Defendants interfered with her rights as protected by the NYCHRL.

Am. Compl. ¶ 227.  The Court disagrees and, for the reasons discussed herein, grants

Defendants' motion to dismiss this claim.

---

[8] For example, as discussed *supra*, Plaintiff alleges that Silvasan was responsible for
constructively demoting her while elevating Cuttic.  *See* Am. Compl. ¶¶ 10, 104.  She alleges
that McDonald, who accused Plaintiff of "insubordination" for suing him, pressured her into
signing an allegedly retaliatory, revised contract after she complained of discrimination.  *See id.*
¶¶ 137, 198.  And she alleges that Neely, who was "pissed off" about being sued, joined a
resolution removing Plaintiff and promoting a male replacement after she complained of
discrimination.  *Id.* ¶¶ 189, 199.

### 1. Legal Standards

Plaintiff's interference with protected rights claim is brought pursuant to NYCHRL § 8-107(19), which provides that:

> it shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of such person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

To state a claim under this provision, Plaintiff must allege that she was subjected to a threat. *See Roelcke* v. *Zip Aviation, LCC*, No. 15 Civ. 6284, 2018 WL 1792374, at *9 (S.D.N.Y. Mar. 26, 2018). A "threat" is "the creation of '[a]n impression of impending injury.'" *Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 11, 2014) (quoting *United States* v. *Davila*, 461 F.3d 298, 302 (2d Cir. 2006)). Although there is "scant authority on this provision of the NYCHRL," *Rosas* v. *Balter Sales Co.*, No. 12 Civ. 6557, 2015 WL 12915807, at *12 n.25 (S.D.N.Y. Mar. 30, 2015), "some federal courts have hesitated to construe it as coterminous or duplicative of the NYCHRL's retaliation provisions." *Cadet v. All. Nursing Staffing of New York, Inc.*, 632 F. Supp. 3d 202, 236-37 (S.D.N.Y. 2022). "[T]here must [be] some affirmative threat *beyond the adverse employment action itself*." *Id.* at 237 (emphasis added); *see also Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758, 2021 WL 930710, at *8 (S.D.N.Y. Mar. 11, 2021) (requiring allegations of "affirmatively coercive, intimidating, or threatening" actions).

### 2. Application

Plaintiff alleges only that Defendants "threatened to terminate Palmer's employment if she did not sign their revised and retaliatory employment agreement." Pl.'s Opp'n 23; *see generally* Am. Compl. In other words, she alleges no threat beyond the adverse employment action itself, and has thereby failed to identify any cognizable "threat" under this provision of the

NYCHRL.  "To hold otherwise . . . would make Plaintiff's retaliation claim and 'interference with protect[ed] rights' claim entirely duplicative, despite the fact that these are separate provisions of the NYCHRL."  *Cadet*, 632 F. Supp. 3d at 237.  Accordingly, the Court dismisses Count VI.

### E.  Whistleblower (Count VIII)

Plaintiff alleges that she is entitled to New York's whistleblower protections.  *See* Am. Compl. ¶¶ 235-239.  For the reasons stated herein, the Court disagrees.  It therefore grants Defendants' motion to dismiss this claim.

### 1.  Legal Standards

Whistleblower retaliation "incorporates policies, elements and remedies distinct from those of Title VII."  *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017). In New York, employers are prohibited "from taking retaliatory employment action against an employee who, *inter alia,* discloses to a supervisor any activity that is in violation of law, which violation 'creates and presents a substantial and specific danger to the public health or safety.'" *Barker v. Peconic Landing at Southold, Inc.*, 885 F. Supp. 2d 564, 567 (E.D.N.Y. 2012) (emphasis in original) (citing N.Y. Lab. L. § 740(2)(a)).  "[T]o fall afoul of the [whistleblower] statute, the adverse action [taken against an employee] must be taken 'because' the employee engaged in protected activity. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity."  *Varughese v. Mount Sinai Med. Ctr.*, No. 12 Civ. 8812, 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015), *aff'd*, No. 15 Civ. 1328, 693 F. App'x. 41, 41-42 (2d Cir. 2017).

### 2. Application

In essence, Plaintiff argues that because she believed she was legally obligated to disclose the existence of her lawsuit to ABL lenders, did so, and was subsequently terminated, she may state a claim against all Defendants under New York's whistleblower law. *See* Am. Compl. ¶¶ 191-192; Pl.'s Opp'n 25 ("Defendants fired Palmer shortly after she protested that Defendants were trying to hide the existence of her lawsuit from lenders.").

Her allegations are insufficient as a matter of law. First, Plaintiff fails to allege that she disclosed or threatened to disclose to any *supervisor* any alleged violation of a law, rule or regulation.[9] *See Barker*, 885 F. Supp. 2d at 567. Second, Plaintiff does not plead anywhere in her Amended Complaint that Defendants' alleged violations of any law, rule, or regulation "pose[d] a substantial and specific danger to the public health or safety." *Rinaldi v. Mills*, No. 21 Civ. 2630, 2022 WL 17480081, at *2 (2d Cir. Dec. 7, 2022); *see also Coyle v. Coll. of Westchester, Inc.*, 87 N.Y.S.3d 242, 244 (App. Div. 2018) (holding that while a plaintiff need not identify any specific law, rule, or regulation that the defendant allegedly violated, a plaintiff must nonetheless allege a specific danger to the public health or safety—even at the motion to dismiss stage). Plaintiff therefore fails at base to allege the elements of a whistleblower claim, and Count VIII is properly dismissed.

### CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. Specifically, Counts VI and VIII are dismissed against all Defendants. All other claims survive.

---

[9] Plaintiff alleges only that she disclosed an apparent violation of "legal obligations" to ABL lenders and that when Staebler and McDonald—who were not her supervisors—found out, they "lashed out at her" for it. *See* Am. Compl. ¶¶ 191-192.

The Clerk of Court is directed to terminate ECF No. 61.  The parties are directed to file an amended proposed case management plan and scheduling order (*available at* https://www.nysd.uscourts.gov/hon-dale-e-ho) and joint status letter within **two weeks** of publication of this Opinion & Order.

SO ORDERED.

Dated:  August 13, 2024
         New York, New York

                                                    _____
                                                              DALE E. HO
                                                    United States District Judge